## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MARY S. STOTMEISTER,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-01193 (TFH)**[1] |
| **ALION SCIENCE & TECH. CORP.,** *et al.*, | |
| **Defendants.** | |

### MEMORANDUM OPINION

Pending before the Court is the Joint Motion for Summary Judgment of Alion Science and Technology Corporation, Cherry Hill Construction, Inc., Day & Zimmerman Group Services, DC Water and M&M Welding & Fabricators, Inc. on the Issue of Frank Stotmeister's Contributory Negligence [ECF No. 160], which urges the Court to grant summary judgment in the defendants' favor on the ground that the doctrine of contributory negligence bars the plaintiffs from prevailing on their claims for damages relating to fatal injuries Francis ("Frank") Stotmeister sustained while working on a construction project on April 23, 2004. After the

---

[1]     On July 8, 2011, the Court issued an order consolidating the following cases: 05-cv-00545, 06-cv-00834, 05-cv-00813 and 08-cv-01193. *Stotmeister v. Alion Science & Tech. Corp.*, No. 05-cv-00813, Order (July 8, 2011) [ECF No. 95]. Stipulations of dismissal were later filed in 05-cv-00545 and 06-cv-00834, as well as in 10-cv-02280, which was another related case that was never consolidated. Consequently, only 08-cv-01193 and 05-cv-00813 remain active. From this Court's perspective, this decision and the accompanying order resolve all remaining claims pending in 08-cv-01193, with the exception of a MOTION FOR RECONSIDERATION AND CLARIFICATION [ECF No. 151] that was filed by Day & Zimmerman Services, Inc. on June 7, 2011. That motion will be addressed separately. With respect to any causes of action pending in 05-cv-00813, the Court views this decision as rendering moot those causes of action, as indicated in the accompanying order.

motion was filed, the plaintiffs entered into settlement agreements with all the moving

defendants except Day & Zimmerman Group Services ("Day & Zimmerman") and M&M

Welding & Fabricators, Inc. ("M&M Welding"). Accordingly, the Court considers the merits of

the motion only with respect to Day & Zimmerman and M&M Welding. For the reasons set

forth below, the Court concludes that Frank Stotmeister's injuries were caused by his own

contributory negligence so summary judgment in favor of Day & Zimmerman and M&M

Welding shall be granted. For these same reasons, the Court will deny the Stotmeister Plaintiffs'

Motion to Reconsider [ECF No. 246] and, accordingly, the Joint Motion to Strike Plaintiffs'

Motion to Reconsider [ECF No. 249] and Plaintiffs' Motion for Oral Argument [ECF No. 256]

will be denied as moot.

## APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 56 mandates that "[t]he Court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it

"might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment

stage, however, "the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for

a jury to return a verdict for that party." *Id.*

Although "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party," *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *Anderson*, 477 U.S. at 249 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

The evidence the Court may consider when passing on a summary judgment motion consists of "materials specified in Federal Rule of Civil Procedure 56(c) as well as any material that would be admissible or usable at trial." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 145 (D.C. Cir. 2011) (internal quotation marks omitted). Pursuant to Rule 56(c), the Court is not limited to the evidence cited by the parties but also "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In addition, the Rules of the United States District Court for the District of Columbia state that "[i]n determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1), *available at* http://www.dcd.uscourts.gov/dcd/local-rules.

## THE UNDISPUTED FACTS

The Court reviewed the extensive volumes of evidence that constitute the record in this case and carefully culled and evaluated the facts to determine whether there were any genuine

disputes about facts that could be deemed material to the outcome. On the whole, it frankly is surprising how little dispute there is with respect to the facts, particularly in light of the realization that most of the evidence involved the testimony of witnesses, many of whom were deposed about the same events multiples times, by multiple attorneys, over a period of several years. The witnesses in this case were remarkably concordant in their recollections of the events that took place during the early morning hours on April 23, 2004, so there quite simply were few instances of conflicting evidence that raised genuine disputes.[2] After considering all the evidence and the entire record in this case, the Court finds the following facts to be undisputed.[3]

## A. Grunley-Walsh's Contract with the General Services Administration

The General Services Administration National Capital Region Heating Operation and Transmission District (referred to by its acronym "GSA HOTD") manages and operates the Steam Distribution Complex, which is a "12-mile distribution pipeline that spiders the central business district of Washington, D.C." Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 38, Richard Matkins Dep. 16:1-3 (quote), 198:3-198:9 (Dec. 12, 2007) [ECF No. 204-5]; *id.* at Ex. 103, Carroll Williams Dep. 23:5-23:11 (Oct. 28, 2009)

---

[2]    As a testament to the fact that there was scant contradictory evidence, the Court was able to rely principally on the plaintiffs' -- i.e., the nonmoving parties' – evidence as citation sources for many, if not most, of the undisputed facts. This evidence includes Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2], which the Court notes in most cases disputed only an inference that could be drawn from facts set forth in the defendants' Statement of Material Facts Not In Dispute [ECF No. 160-1] but not the facts themselves. *See* Stotmeister Pls.' Disputed Material Facts ¶¶ 5, 12, 20, 21, 25, 26, 27, 28, 29, 30, 31, 32, 36, 41, 44, 63, 67, 68, 69, 70, 73 [ECF No. 196-2]. Consequently, most of the facts in the defendants' Statement of Material Facts Not In Dispute [ECF No. 160-1] remain undisputed and supported by the evidence in the case.

[3]    All facts discussed in other sections of this opinion also were determined by the Court to be undisputed unless expressly identified as disputed herein. Any facts omitted from this decision were deemed to be immaterial.

[ECF No. 208-6] (confirming that the GSA department that operates high-pressure steam is referred to as "HOTD").[4]  The section of the Steam Distribution Complex that runs beneath 17th Street provides steam to several federal buildings.  *Compare* Statement of Material Facts Not In Dispute ¶ 1 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 1).

In 2002, GSA HOTD entered into a task-order contract with Grunley-Walsh Joint Venture, Inc. ("Grunley-Walsh") that ultimately required Grunley-Walsh to replace a section of the Steam Distribution Complex running under 17th Street from the so-called "Point of Connection" -- which was located at the intersection of 17th Street and New York Avenue -- to Manhole 8.[5]  *Compare* Statement of Material Facts Not In Dispute ¶ 2 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 2); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 118:16-124:18, 129:1-136:22, 145:1-145:7 (Mar. 16, 2007) [ECF No. 206-5]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 7, Westphal Decl.

---

[4]     The evidence in the case is voluminous and many documents cited in this decision were submitted by the various parties pursuant to other prior proceedings.  To assist the parties or others who might be reviewing this decision, the Court has identified not only the title of a document and pinpoint citation but also the Electronic Case Filing ("ECF") number to facilitate efficient cross reference to the record evidence.  There also are many individuals whose deposition testimony is cited or who otherwise are identified in this decision so, albeit somewhat cumbersome, for clarity the Court generally refers to individuals by their full name.

[5]     The 2002 contract originally required Grunley-Walsh to perform asbestos abatement in the steam tunnels, replace condensate lines and provide new insulation.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 118:16-120:13, 129:2-129:20, 130:22-131:21, 136:11-136:15 (Mar. 16, 2007) [ECF No. 206-5]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 10, Scope of Work ¶ A [ECF No. 122-1].  In 2003, however, a change order modified the contract to require replacing the steam system.  United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 1, Scope of Work ¶ 8 [ECF No. 122-1].

¶ 3 [ECF No. 122-1]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 10 (Order No. P-11-02-YT-0256) [ECF No. 122-1]. The project was referred to as the "17th Street Steam Distribution Project" and involved, among other things, excavating 17th Street to remove the existing steam and condensate pipes and install new pipes. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 118:6-118:8, 129:15-129:20, 131:7-131:21 (Mar. 16, 2007) [ECF No. 206-5]; Day & Zimmerman's Opp'n to the United States' Mot. for Summ. J. Ex. 10, Greg Westphal Decl. ¶ 4 [ECF No. 94-9].

Although Grunley-Walsh was the prime contractor responsible for performing the 17th Street Steam Distribution Project, Grunley-Walsh entered into subcontracts with other companies to assist with the required work. Mem. of P. & A. In Supp. of Pls.' Partial Opp'n to Third Party Def. U.S.A.'s Mot. for Summ. J. 2-3 [ECF No. 97] (stating that Grunley-Walsh was hired to be the general contractor); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 145:5-145:11 (Mar. 16, 2007) [ECF No. 206-5]; id. at Ex. 73, Bassem Soueidan Dep. 31:1-31:8 (May 25, 2010) [ECF No. 206-8]. Grunley-Walsh hired M&M Welding to replace the components of the steam system and install a temporary boiler in Manhole 11. Mem. of P. & A. In Supp. of Pls.' Partial Opp'n to Third Party Def. U.S.A.'s Mot. for Summ. J. 3 [ECF No. 97]. Grunley-Walsh also contracted with Cherry Hill Construction, Inc. ("Cherry Hill") to excavate, insulate, and perform back-filling services for the 17th Street Steam Distribution Project. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 145:1-145:4 (Mar. 16, 2007) [ECF No. 206-5].

After Grunley-Walsh began performing the contract work for the 17th Street Steam Distribution Project, GSA HOTD issued a change order that modified Grunley-Walsh's contract to require the installation of an 8-inch water service line between Manhole 7 and Manhole 9 as part of an effort to modernize the Old Executive Office Building. *Compare* Statement of Material Facts Not In Dispute ¶ 34 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 34); *compare* Statement of Material Facts Not In Dispute ¶ 13 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 13); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 133:2-133:22, 136:11-136:17 (Mar. 16, 2007) [ECF No. 206-5]; *id.* at Ex. 33, Thomas Johnson Dep. 340:12-340:16, 450:3-450:10, 484:3-484:11 (Nov. 17, 2010) [ECF No. 203-5]; *id.* at Ex. 74, Brian Staudenmaier Dep. 51:7-52:5 (Mar. 12, 2008) [ECF No. 207-1]; *id.* at Ex. 91, Greg Westphal Decl. ¶ 5(b) [ECF No. 207-18]; *id.* at Ex. 65, Dayrell Schneider Dep. 28:10-29:17, 30:12-31:12 (Dec. 10, 2007) [ECF No. 205-15]. The water line tie-in project involved cutting into the existing 20-inch main water line to connect or "tap" a new 8-inch water line. *Compare* Statement of Material Facts Not In Dispute ¶ 36 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts ¶ 36 [ECF No. 196-2] (asserting that the scope of Cherry Hill's work was not limited to cutting and tapping the water line but otherwise not disputing that "[i]nstallation of the water service line required Cherry Hill to tie-into existing 20" and 8" water mains maintained by DC Water"); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 91, Greg Westphal Decl. ¶ 5(b) [ECF No. 207-18]; *id.* at Ex. 94, Greg Westphal Dep. 28:17-28:24 (Apr. 13, 2010) [ECF No. 207-21]; Ex. 112, Record of Change Order Negotiation (Mar. 12, 2004)

[ECF No. 208-15].  Grunley-Walsh subcontracted the water line tie-in project to Cherry Hill. *Compare* Statement of Material Facts Not In Dispute ¶ 35 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 35); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 28:10-28:20 (Dec. 10, 2007) [ECF No. 205-15].

By the time Grunley-Walsh and Cherry Hill were set to begin the water line tie-in project, all work on the 17th Street Steam Distribution Project had been completed and the steam system was back in service.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 188:15-188:19 (Mar. 16, 2007) [ECF No. 206-5]. Grunley-Walsh's President, Bassem Soueidan, explained that "all of the steam system had been completed[,] inspected, tested, punched out – punch list – verified, accepted" and "the only thing that was left was, in fact, the installation of the water main, which was a change order."  United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 17, Bassem Soueidan Dep. 49:12-49:16 (Jan. 18, 2008) [ECF No. 122-1]; United States. Mot. for Summ. J. Ex. 4, Bassem Soueidan Dep. 11:4-11:6 (Jan. 18, 2008) [ECF No. 85-1] (identifying himself as Grunley-Walsh's president).  Soueidan confirmed that, because the contractors had finished and turned over the steam system, "[n]othing was contemplated that would involve a shutdown of the steam line in connection with the work that remained on the [water line tie-in] project."  Third Party Def. United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 1, Bassem Soueidan Dep. 49:4-49:7 (May 25, 2010) [ECF No. 106-2].

**B.      The Water Line Tie-In Project Begins Late**

On the night of April 22, 2004, Grunley-Walsh and Cherry Hill began work on the water line tie-in project.  *Compare* Statement of Material Facts Not In Dispute ¶¶ 37, 38 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraphs 37 and 38); Day & Zimmerman's Mot. for J. on the Pleadings Ex. B, Greg Westphal Decl. ¶ 5 [ECF No. 32-4].  Grunley-Walsh's Superintendent, Frank Stotmeister, was supervising the water line tie-in project and had oversight responsibility for all the work and subcontractors.  *Compare* Statement of Material Facts Not In Dispute ¶ 3 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 3); *see also* J.A. In Supp. of Joint Mot. for Summ. J. Ex. A, Brian Staudenmaier Dep. 14:6-14:9 (Mar. 12, 2008) [ECF No. 161-1].  The Cherry Hill supervising personnel who reported to Frank Stotmeister that night included Joseph Hudert, who was Cherry Hill's Superintendent, Dayrell Schneider, who was Cherry Hill's Utility Divisional Manager, and Gary Sims, who was the Foreman of the Cherry Hill pipe crew performing the water line tie-in project.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 13:20-13:21, 21:1-22:6, 24:2-24:21 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 70:10-70:16, 205:7-205:8 (May 12, 2010) [ECF No. 206-1].

The water line tie-in project began inauspiciously.  The District of Columbia Water and Sewer Authority ("DC WASA") crew was late performing the water main shutdown that was necessary before the Grunley-Walsh and Cherry Hill contractors could begin cutting the main pipe for the water line tie-in project.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 28, Dexter Holmes Dep. 136:1-136:3, 148:20-152:17 (Dec. 9,

2010) [ECF No. 202-15]; *id.* at Ex. 32, Thomas Johnson Dep. 96:3-106:22 (Oct. 19, 2010) [ECF No. 203-4]; *id.* at Ex. 65, Dayrell Schneider Dep. 130:8-131:9 (stating that he was notified that the water main was shut down between 1:00 a.m. and 2:00 a.m.), 134:20-135:20 (Dec. 10, 2007) [ECF No. 205-15]; *compare* Statement of Material Facts Not In Dispute ¶ 37 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 37). As a result, the water main was not shut off until between 1:00 a.m. and 2:00 a.m. on April 23, 2004, which caused concern among the contractors about whether they could meet a 5:30 a.m. deadline to complete the water line tie-in project and reopen the street to traffic. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. Ex. 65, Dayrell Schneider Dep. 130:8-131:9, 134:20-135:20, 138:4-138:16 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 31, Thomas Johnson Dep. 136:15-136:17 (Feb. 4, 2008) [ECF No. 203-3] (confirming that the job should have been completed around 5:30 a.m.); *id.* at Ex. 66, Dayrell Schneider Dep. 69:14-70:19, 93:5-93:22 (indicating a 5:30 a.m. deadline), 252:4-252:10 (May 12, 2010) [ECF No. 206-1]; Joint Mot. for Summ. J. of Alion Science & Technology Corp., Cherry Hill Construction, Inc., Day & Zimmerman Group Servs., DC Water and M&M Welding & Fabricators, Inc. On the Issue of Frank Stotmeister's Contributory Negligence [hereinafter cited as "Joint Mot. for Summ. J."] Ex. K, Gary Sims Dep. 171:4-171:18 (July 7, 2010) [ECF No. 162-4]; *id.* at Ex. M, Dayrell Schneider Dep. 39:14-39:16 (May 12, 2010) [ECF No. 162-6]. Frank Stotmeister, Dayrell Schneider and Joseph Hudert conferred, however, and agreed to proceed with the water line tie-in project notwithstanding the delay.[6] Exs. In Supp. of

---

[6] Dayrell Schneider testified that someone from GSA was present for this discussion but he was uncertain about that individual's identity. Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 146:8-146:14 (Dec. 10, 2007)

Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 32, Thomas Johnson Dep. 100:22-104:15 (Oct. 19, 2010) [ECF No. 203-4]; *id.* at Ex. 65, Dayrell Schneider Dep. 134:20-135:20, 138:4-138:16 (Dec. 10, 2007) [ECF No. 205-15] (explaining that "[i]t was a joint decision, Frank, Joe, myself"); *id.* at Ex. 66, Dayrell Schneider Dep. 69:16-70:19, 170:2-171:16, 252:4-252:18 (May 12, 2010) [ECF No. 206-1].

## C. Water Floods the Steam Vault and Causes the Steam Pipes to Hammer

Between 2:00 a.m. and 2:30 a.m., the contractors began cutting the water main pipe so the pipe could drain. *Compare* Statement of Material Facts Not In Dispute ¶ 38 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 38); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 71:5-71:12, 144:4-147:6 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 39:14-40:3 (May 12, 2010) [ECF No. 206-1]; *id.* at Ex. 67, Gary Sims Dep. 79:2-80:15 (July 7, 2010) [ECF No. 206-2]; *id.* at Ex. 91, Greg Westphal Decl. ¶ 5(c) (Apr. 28, 2005) [ECF No. 207-18]; *id.* at Ex. 25, Dexter Holmes Dep. 189:15-189:18 (Dec. 9, 2010) [ECF No. 202-12]. The water never fully drained, however, and continued to flow from the main pipe into the trench where the contractors were working. Stotmeister Pls.' Disputed Material Facts ¶ 39 [ECF No. 196-2] (stating that "[t]hroughout the process of Cherry Hill's cutting the water main, water steadily flowed out of the pipe"); Exs. In Supp. of Stotmeister Pls.'

---

[ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 70:10-70:16, 170:5-171:9, 252:4-252:18 (May 12, 2010) [ECF No. 206-1]. In 2008, Thomas Johnson testified that he was present when the discussion occurred, Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 31, Thomas Johnson Dep. 42:14-44:16 (Feb. 4, 2008) [ECF No. 203-3], but in 2010 he testified that Kevin Moore, an inspector for Alion, was present, *id.* at Ex. 32, Thomas Johnson Dep. 102:9-102:18 (Oct. 19, 2010) [ECF No. 203-4]. The identity of the other individual who was present is not material to the outcome of this case, however.

Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 171:12-172:21, 220:11-221:3 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 39:14-39:16 (May 12, 2010) [ECF No. 206-1]. As the contractors proceeded to make additional cuts into the main pipe a significant amount of water continued to flow and accumulate in the trench despite the use of four electric pumps to dewater.[7] Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 151:1-151:21, 154:3-155:21, 171:12-172:21 (Dec. 10, 2007) [ECF No. 205-15].

Within about thirty minutes of the contractors making the initial cuts to the water main pipe, the accumulating water overflowed the trench and began to run into the steam vault toward Manholes 9 and 10 where it made contact with the uninsulated steam pipes. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 157:6-157:21, 173:11-173:21, 208:1-208:9 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 184:19-185:3 (May 12, 2010) [ECF No. 206-1]; *id.* at Ex. 67, Gary Sims Dep. 128:5-128:10, 175:20-177:10, 213:21-214:22, 224:16-224:22 (July 7, 2010) [ECF No. 206-2]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. L, Dayrell Schneider Dep. 168:9-168:19 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex. M, Dayrell Schneider Dep. 81:19-83:22, 85:5-86:20 (May 12, 2010) [ECF No. 162-6]; Stotmeister Pls.' Disputed Material Facts ¶ 72 [ECF No. 196-2] (stating that "the water flowing from the 20-inch water main entered the steam vault" and "contacted the steam lines"). As a result, steam rose out of the manholes and two steam pipes

---

[7]     Dayrell Schneider stated that "[t]he volume of water overwhelmed us because even when the whole piece was cut out, you still had a 4- or 5-inch flow, which is not normal." Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 190:14-190:17 (May 12, 2010) [ECF No. 206-1].

that were within 10 feet of the contractors began to visibly and audibly hammer,[8] causing

Dayrell Schneider and Gary Sims, who were in charge of the pipe crew, to fear for their safety.[9]

Stotmeister Pls.' Disputed Material Facts ¶ 72 [ECF No. 196-2] (stating that "the steam pipes

jumped and made a loud hammering noise"); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A.

In Opp'n to Mots. for Summ. J. Ex. 31, Thomas Johnson Dep. 47:19-48:21 (Feb. 4, 2008) [ECF

No. 203-3]; *id.* at Ex. 65, Dayrell Schneider Dep. 157:6-157:21, 208:1-208:12 (Dec. 10, 2007)

[ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 83:13-84:6, 86:4-89:20, 101:3-101:21,

200:12-201:9, 208:8-209:15, 233:21-237:21, 249:19-250:5 (May 12, 2010) [ECF No. 206-1]; *id.*

at Ex. 67, Gary Sims Dep. 91:7-94:22, 213:1-214:22 (July 7, 2010) [ECF No. 206-2]; *id.* at Ex.

68, Gary Sims Dep. 285:12-286:18, 328:2-328:9 [ECF No. 206-3]; *id.* at Ex. 28, Dexter Holmes

Dep. 169:4-169:19, 171:17-172:2 (Dec. 9, 2010) [ECF No. 202-15]; J.A. In Supp. of Joint Mot.

for Summ. J. Ex. K, Gary Sims Dep. 91:7-94:22 (July 7, 2010) [ECF No. 162-4]; *id.* at Ex. L,

Dayrell Schneider Dep. 167:21-171:4, 224:1-224:11 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex.

M, Dayrell Schneider Dep. 298:14-300:20 (May 12. 2010) [ECF No. 162-6]; *compare* Statement

of Material Facts Not In Dispute ¶ 40 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material

Facts [ECF No. 196-2] (indicating no dispute with paragraph 40).

---

[8]     There is conflicting evidence about whether the hammering was a single incident or whether it was ongoing while the water main pipe was being cut. *Compare*, *e.g.*, Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 101:17-101:21 (May 12, 2010) [ECF No. 206-1] (agreeing that there was only one water hammer that night), *with* Ex. 67, Gary Sims Dep. 92:7-92:20 (July 7, 2010) [ECF No. 206-2] (stating that the hammering lasted "[f]or approximately the entire time" the cuts were being made to the water main).  The duration of the hammering is, however, immaterial to the outcome of this case.

[9]     Dexter Holmes also stated that he found the hammering to be "dangerous to a degree." Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 28, Dexter Holmes Dep. 169:4-169:17, 171:17-172:2 (Dec. 9, 2010) [ECF No. 202-15].

**D.**     **Frank Stotmeister Refuses to Shut Down the Steam System Despite Dayrell Schneider's Multiple Requests**

When the steam pipes hammered, Dayrell Schneider ordered the contractors to get out of the trench and asked Frank Stotmeister three times to shut down the steam system so the contractors could work safely on the water line tie-in project. *Compare* Statement of Material Facts Not In Dispute ¶ 41 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts ¶ 41 [ECF No. 196-2] (indicating no dispute that Dayrell Schneider ordered the crew to evacuate the trench because he was alarmed); *compare* Statement of Material Facts Not In Dispute ¶ 43 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 43); J.A. In Supp. of Joint Mot. for Summ. J. Ex. L, Dayrell Schneider Dep. 167:20-169:14, 223:9-224:19 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex. M, Dayrell Schneider Dep. 298:14-300:20 (May 12, 2010) [ECF No. 162-6]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 84:3-84:6, 86:4-86:20, 208:12-209:15, 250:6-250:22 (May 12, 2010) [ECF No. 206-1]; *id.* at Ex. 67, Gary Sims Dep. 213:17-213:20 (July 7, 2010) [ECF No. 206-2]; *id.* at Ex. 68, Gary Sims Dep. 297:18-298:17, 328:2-328:13, 329:3-329:11 (Mar. 2, 2011) [ECF No. 206-3]. Frank Stotmeister refused, however, to shut down the steam system and, instead, assured Dayrell Schneider that it was safe to proceed without turning off the steam:

> Frank came over and basically said that we're going to be okay, Dayrell. We just dealt with mother nature. We have had three inches [of rain]. Look at the weather reports.

This steam system is not designed to drain water anytime, anywhere. We've seen these steam lines jump like that before. This is schedule[] 80.[10] I said, I'm not an expert with scheduled 80; but he says, It will be okay.

I said, Why don't you just go back to the source and shut the steam line down; and we won't even have this conversation. And he assured me that we're okay. And we made the decision to go back in.

J.A. In Supp. of Joint Mot. for Summ. J. Ex. L, Dayrell Schneider Dep. 170:2-170:15 (Dec. 10, 2007) [ECF No. 162-5] (capitalization in original). *Compare* Statement of Material Facts Not In Dispute ¶ 43 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 43); J.A. In Supp. of Joint Mot. for Summ. J. Ex. L., Dayrell Schneider Dep. 168:4-168:8 (Dec. 10, 2007) [ECF No. 162-5]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 7, Greg Westphal Decl. ¶ 5(d) (Apr. 28, 2005) [ECF No. 122-1] (stating that "Grunley-Walsh Construction Superintendent, Frank Stotmeister, instructed Cherry Hill employees that it was safe to continue working and that the steam lines . . . could withstand the water hammering"). Rather than shut down the steam system, Frank Stotmeister directed the contractors to dump ten tons of recycled material into the trench to create a temporary berm to control the water flowing from the water main pipe into the steam vault. *Compare* Statement of Material Facts Not In Dispute ¶ 44 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts ¶ 44 [ECF No. 196-2] (indicating no dispute with the facts contained in paragraph 44 but disputing the inference that Cherry Hill controlled the water contacting the steam line after the berm was created); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 183:11-183:19, 238:1-238:15 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 67, Gary Sims Dep. 177:11-177:15 (July 7,

---

[10] Frank Stotmeister was referring to the thickness of the metal pipe. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 209:18-22 (May 12, 2010) [ECF No. 206-1].

2010) [ECF No. 206-2]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. K, Gary Simms Dep. 101:12-103:4 (July 7, 2010) [ECF No. 162-4]; *id.* at Ex. M, Dayrell Schneider Dep. 192:16-193:13 (May 12, 2010) [ECF No. 162-6]; *id.* at Ex. I, Dexter Holmes Dep. 188:1-188:3 (Dec. 9, 2010) [ECF No. 162-2] (indicating that the berm was created after the contractors evacuated the trench). Despite the berm, though, water continued to accumulate in the trench and overflow into the steam vault. Stotmeister Pls.' Disputed Material Facts ¶ 44 [ECF No. 196-2] (stating that water continued to flow into the steam vault after the berm was created).

### E. Water Condensation Causes the Steam Pipes in the New Executive Office Building to Hammer, Which Damages the Steam System and Sets Off a Fire Alarm

The New Executive Office Building ("NEOB") is heated by a steam station that is connected to the 17th Street steam line via a six-inch line that branches from Manhole 11. *Compare* Statement of Material Facts Not In Dispute ¶ 45 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 45); J.A. In Supp. of Joint Mot. for Summ. J. Ex. N, James Plakas Dep. 20:8-21:1 (Oct. 6, 2009) [ECF No. 162-7]. At around the same time the contractors in the trench observed steam pipes hammering, a fire alarm went off at the NEOB. J.A. In Supp. of Joint Mot. for Summ. J. Ex. KK, Letter from Tisa B. Smith, Information and Privacy Officer, D.C. Fire/EMS Dept., to James Jordan (May 3, 2010) [ECF No. 163-16] (attaching an incident log reflecting an emergency contact around 3:00 a.m. at the NEOB); *id.* at Ex. P, Thomas Johnson Dep. 356:13-356:19 (Nov. 17, 2010) [ECF No. 162-9]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 31, Thomas Johnson Dep. 54:16-55:7 (Feb. 4, 2008) [ECF No. 203-3]; *id.* at Ex. 32, Thomas Johnson Dep. 155:4-156:21 (Oct. 19, 2010) [ECF No. 203-4]; *compare* Statement of Material Facts Not In Dispute ¶ 46 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF

No. 196-2] (indicating no dispute with paragraph 46). Plumbers working at the NEOB discovered that a pressure-relief valve at the NEOB steam station was blowing steam and water, which was unusual and indicated that the steam system was full of condensation. *Compare* Statement of Material Facts Not In Dispute ¶ 46 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 46); J.A. In Supp. of Joint Mot. for Summ. J. Ex. Q, Darrell Jackson Dep. 22:1-28:22 (Jan. 28, 2010) [ECF No. 162-10]; *id.* at Ex. R, Marion Christopher Yewell Dep. 25:2-32:13, 35:21-36:9, 37:3-37:14 (Dec. 3, 2009) [ECF No. 162-11]; *id.* at Ex. T, Richard Julian Dep. 38:7-15 (Oct. 9, 2009) [ECF No. 162-13]. The steam released from the damaged pressure-relief valve had caused heat detectors in the steam station to activate the fire alarm. *Compare* Statement of Material Facts Not In Dispute ¶ 46 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 46).

The plumbers at the NEOB shut off the steam system isolation valves to prevent steam from entering the NEOB steam station and then proceeded to drain the condensation out of the pipes. *Compare* Statement of Material Facts Not In Dispute ¶ 47 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 47); J.A. In Supp. of Joint Mot. for Summ. J. Ex. R, Marion Christopher Yewell Dep. 32:14-35:12, 40:3-41:3 (Dec. 3, 2009) [ECF No. 162-11]. After the condensation was drained from the system, the plumbers replaced a gasket that had been blown out of the pressure-relief valve and then the plumbers attempted to slowly turn the valve back on to reestablish steam. *Compare* Statement of Material Facts Not In Dispute ¶ 49 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 49); J.A. In

Supp. of Joint Mot. for Summ. J. Ex. R, Marion Christopher Yewell Dep. 35:6-41:11 (Dec. 3, 2009) [ECF No. 162-11]; *id.* at Ex. T, Richard Julian Dep. 42:6-42:8 (Oct. 9, 2009) [ECF No. 162-13]; Exs. In Supp. of Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex. 14, Marion Christopher Yewell Dep. 135:3-135:5 (Dec. 3, 2009) [ECF No. 97-14]. When the plumbers tried to reestablish steam, however, the steam pipes began to hammer so dramatically that the valve wheel started turning on its own. *Compare* Statement of Material Facts Not In Dispute ¶ 49 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 49); J.A. In Supp. of Joint Mot. for Summ. J. Ex. R, Marion Christopher Yewell Dep. 42:6-44:19, 71:5-72:21 (Dec. 3, 2009) [ECF No. 162-11]; *id.* at Ex. T, Richard Julian Dep. 42:9-45:14, 47:15-47:21 (Oct. 9, 2009) [ECF No. 162-13]. Frightened by what was happening at the NEOB steam station, the plumbers quickly left the building. Exs. In Supp. of Pls.' Partial Opp'n to Unites States' Mot. for Summ. J. Ex. 14, Marion Christopher Yewell Dep. 135:3-135:18 (Dec. 3, 2009) [ECF No. 97-14]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. Q, Darrell Jackson Dep. 28:13-28:22 (Jan. 28, 2010) [ECF No. 162-10]; *id.* at Ex. T, Richard Julian Dep. 47:19-47:21 (Oct. 9, 2009) [ECF No. 162-13].

**F.      Frank Stotmeister Closes the Feeder Valve In Manhole 11**

On the street, the plumbers ran into Thomas Johnson, who was a government contractor employed by Alion Science and Technology Corporation ("Alion"). Def./Cross Def.'s Submission In Resp. to Order of April 12, 2011 1 [ECF No. 120-1]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 40, Larry Melton Dep. 37:11-38:5 (Mar. 9, 2010) [ECF No. 204-7]; Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex. 15,

James D. Rosenberger Dep. 49:19-49:21, 156:4-156:7 (Dec. 1, 2009) [ECF No. 97-15]. Alion[11] had a contract with the GSA's White House Project's Office to perform construction management services for certain designated projects pursuant to work orders issued under the contract. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 2, Alion Contract IB1-IC1 (ALI 00017-20) [ECF No. 201-2]; Def./Cross Def.'s Submission In Resp. to Order of April 12, 2011 1 [ECF No. 120-1]. Thomas Johnson was on 17th Street the night of April 23, 2004, because he was supervising a water-fountain construction project at the NEOB for the White House Service Center. Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex. 17, Thomas Johnson Dep. 49:4-49:12 (Oct. 19, 2010) [ECF No. 97-17]; United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 6, Thomas Johnson Dep. 433:1-433:21 (Nov. 17, 2010) [ECF No. 106-2]. Thomas Johnson also had been a Project Manager for the 17th Street Steam Distribution Project. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 40, Larry Melton Dep. 37:11-38:5, 39:9-40:5 (Mar. 9, 2010) [ECF No. 204-7]; Third Party Def.'s Combined Reply In Supp. of Mot. for Summ. J. Ex. 1, Bassem Soueidan Dep. 31:9-31:15 (May 25, 2010) [ECF No. 106-2]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 2, Greg Westphal Dep. 379:3-379:9 (Apr. 13, 2010) [ECF No. 122-1].

---

[11]    The indefinite-delivery-indefinite-quantity contract was executed by Alion's predecessor, ANADAC, Inc., and the GSA. Def./Cross Def.'s Submission In Resp. to Order of April 12, 2011 Ex. 1 [ECF No. 120-1].

One of the plumbers[12] told Thomas Johnson about the hammering at the NEOB steam station and asked to have the steam to the NEOB shut off in the street so the plumbers could change a valve. *Compare* Statement of Material Facts Not In Dispute ¶ 50 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 50); Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex. 15, James D. Rosenberger Dep. 49:19-50:9, 156:4-157:17, 161:2-162:14 (Dec. 1, 2009) [ECF No. 97-15]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. T, Richard B. Julian Dep. 54:13-55:2 (Oct. 9, 2009) [ECF No. 162-13]; *id.* at Ex. O, Thomas Johnson Dep. 87:10-87:22 (Mar. 12, 2007) [ECF No. 162-8]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 30, Thomas Johnson Dep. 20:7-20:20, (Mar. 12, 2007) [ECF No. 203-2]. Thomas Johnson relayed the plumbers' request to Frank Stotmeister and asked Stotmeister to shut the steam off.[13]

---

[12]     It is unclear from the evidence who actually told Thomas Johnson about the hammering but that detail is immaterial and there is no dispute that one of the plumbers did. *Compare* Statement of Material Facts Not In Dispute ¶ 50 [ECF No. 160-1] (stating that James Rosenberger told Thomas Johnson about the hammering), *and* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 50), *with* Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex. 15, James D. Rosenberger Dep. 161:10-161:17, 162:1-162:6 (Dec. 1, 2009) [ECF No. 97-15] (stating that he could not recall whether he told Thomas Johnson about the hammering).

[13]     There is a factual dispute about whether Thomas Johnson asked Frank Stotmeister to shut the steam off at Manhole 7 or Manhole 11. *Compare* J.A. In Supp. of Joint Mot. for Summ. J. Ex. P, Thomas Johnson Dep. 120:4-121:1 (Feb. 4, 2008) [ECF No. 162-9] (stating "I just asked if it could be shut down at manhole 7"), *with* Stotmeister Pls.' Disputed Material Facts ¶ 51 [ECF No. 196-2] (disputing paragraph 51 of the defendants' Statement of Material Facts Not In Dispute and stating that "Tom Johnson asked Frank Stotmeister to shut off the steam in Manhole 11"). The dispute arises from conflicts between Thomas Johnson's deposition testimony and Bassem Soueidan's deposition testimony. Thomas Johnson asserts that he asked Frank Stotmeister whether it was possible to turn the steam off at Manhole 7. J.A. In Supp. of Joint Mot. for Summ. J. Ex. P, Thomas Johnson Dep. 121:8-123:3 (Feb. 4, 2008) [ECF No. 162-9]; *id.* at Ex. O, Thomas Johnson Dep. 88:6-88:22 (Mar. 12, 2007) [ECF No. 162-8] (stating "yes, I did walk up to Frank and ask him if he could shut down the steam in manhole number 7"). Bassem

*Compare* Statement of Material Facts Not In Dispute ¶¶ 51, 52 [ECF No. 160-1], *with*

Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with

paragraphs 51 and 52); J.A. In Supp. of Joint Mot. for Summ. J. Ex. T, Richard B. Julian Dep.

54:13-55:2 (Oct. 9, 2009) [ECF No. 162-13]; *id.* at Ex. O, Thomas Johnson Dep. 87:10-88:22

(Mar. 12, 2007) [ECF No. 162-8]; *id.* at Ex. P, Thomas Johnson Dep. 95:1-95:9 (Feb. 4, 2008)

[ECF No. 162-9]. A couple of hours later, Frank Stotmeister told Thomas Johnson that the

steam to the NEOB had been shut off at Manhole 11. Exs. In Supp. of Stotmeister Pls.' Mem. of

P. & A. In Opp'n to Mots. for Summ. J. Ex. 31, Thomas Johnson Dep. 142:18-144:14 (Feb. 4,

2008) [ECF No. 203-3].

---

Souiedan, on the other hand, stated during depositions that Thomas Johnson directed Frank
Stotmeister to turn the steam off at Manhole 11. Exs. In Supp. of Stotmeister Pls.' Mem. of P. &
A. In Opp'n to Mots. for Summ. J. Ex. 71, Bassem Soueidan Dep. 101:4-101:6 (Jan. 18, 2008)
[ECF No. 206-6] (stating that Johnson "asked Frank to see what they can do and asked him to
shut the -- the shut-off valve at Manhole 11"). Bassem Soueidan later conceded during a
deposition, however, that he could not recall Thomas Johnson's specific words and implied that
he inferred that Thomas Johnson meant Manhole 11 because Johnson "knew full well" that was
"the only place to shut the steam off":

> Specific words I probably would not remember. But if you are asking me if he
> said, Frank, go inside Manhole 11 and turn the steam off, I don't think I'm in a
> position to say that these were his exact words. But he did say, I asked Frank to
> shut the steam off knowing full well that the only place to shut the steam off is in
> fact inside Manhole 11.

Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 72,
Bassem Soueidan Dep. 146:15-146:22 (Mar. 27, 2008) [ECF No. 206-7]. Ultimately, though,
this disputed fact is immaterial to the outcome, as discussed *infra*.

   The parties also dispute whether Thomas Johnson directed Frank Stotmeister to turn the
steam off or simply asked whether it was possible to do so. Statement of Material Facts Not In
Dispute n.3 [ECF No. 160-1]. For the purpose of resolving the pending motion, however, the
defendants conceded "that Johnson told Stotmeister to turn the steam off." *Id.*

**G.     Frank Stotmeister Attempts to Turn On the Steam-Line Valve in Manhole 11, Which Causes a Water Hammer and Massive Steam Explosion**

By around 6:30 a.m., the Cherry Hill crew had finished the water line tie-in project and was cleaning up the site.  J.A. In Supp. of Joint Mot. for Summ. J. Ex. L, Dayrell Schneider Dep. 174:19-175:17, 186:1-187:20 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex. K, Gary Sims Dep. 301:7-302:2 (Mar. 2, 2011) [ECF No. 162-4]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 28, Dexter Holmes Dep. 189:11-189:14, 195:11-195:19 (Dec. 9, 2010) [ECF No. 202-15]; Stotmeister Pls.' Disputed Material Facts ¶ 57 [ECF No. 196-2] (arguing that the water line tie-in was not completed until between 6:30 a.m. and 7 a.m. and citing Dexter Holmes' deposition testimony stating that "they had the T and mechanical pieces in place around 6:30 a.m., I think").  Shortly thereafter, Thomas Johnson alerted Frank Stotmeister that the GSA plumbers were done fixing the valve in the NEOB steam station and asked Stotmeister to turn the steam back on.[14]  *Compare* Statement of Material Facts Not In Dispute ¶ 59 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 59).

At approximately 8:48 a.m., Frank Stotmeister descended the ladder into Manhole 11 and Joseph Hudert was halfway down the ladder holding a flashlight.  *Compare* Statement of Material Facts Not In Dispute ¶ 62 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 62).  Frank Stotmeister

---

[14]     For the purpose of resolving the pending motion the defendants do not dispute "that Johnson told Stotmeister to turn the steam on."  Statement of Material Facts Not In Dispute ¶ 60 n.4 [ECF No. 160-1].

subsequently "began to open the isolation valve in Manhole 11" to turn the steam back on.[15]

Stotmeister Pls.' Disputed Material Facts ¶¶ 72, 73 [ECF No. 196-2] (paragraph 72 contains the quoted language and both paragraphs support the fact that Frank Stotmeister opened the isolation valve to turn the steam back on).  As a result, a "steam-condensate water hammer" exploded from the steam line in a "massive eruption" of steam that fatally injured Frank Stotmeister and Joseph Hudert.  Stotmeister Pls.' Disputed Material Facts ¶ 72 [ECF No. 196-2].

## DISCUSSION

Day & Zimmerman and M&M Welding contend that the plaintiffs cannot prevail on their claims for compensatory damages arising from Frank Stotmeister's death because Stotmeister was contributorily negligent by failing to act with reasonable care for his own safety, knowingly putting himself in a dangerous situation, and failing to take reasonable steps to protect himself from harm.  Mem. of P. & A. In Supp. of Joint Mot. for Summ. J. 1-15 [ECF No. 160-2].  Aside from the contention that there are material facts in dispute, the plaintiffs' principal counter argument is that Frank Stotmeister's actions opening and closing the steam-line valve in Manhole 11 were reasonable because he was directed to do so by Thomas Johnson, who the plaintiffs assert was the government's representative.  Pls.' Mem. of P. & A. In Opp'n To Defs.' Joint Mot. for Summ. J. 5-26 [ECF No. 196].

---

[15]    The plaintiffs equivocate about whether Frank Stotmeister turned the steam valve off or on, stating that "no direct evidence has been presented that he did . . . ."  Pls. Mem. of P&A In Opp'n to Defs.' Joint Mot. for Summ. J. 6 [ECF No. 196].  The undisputed circumstantial evidence, however, reflects that Frank Stotmeister was the only person who was observed in Manhole 11 that morning (Joseph Hudert was only ever observed standing on the ladder descending into the manhole).  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 50, Kevin Moore Dep. 118:1-118:13 (Jan. 11, 2011) [ECF No. 204-17]; United States' Mot. for Summ. J. Ex. 1, Edwin Reyes Dep. 104:6-105:3, 105:16-105:22, 107:14-107:21, 109:3-109:16 (Jan. 15, 2008) [ECF No. 85-1].

**I.**

"The District of Columbia is one of the few jurisdictions in which the claimant's contributory negligence can act as a complete defense to the defendant's liability for negligence." *Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972, 985 (D.C. 2000). "To establish contributory negligence, the party asserting the defense must prove by a preponderance of the evidence that the opposing party's negligence was a substantial factor in causing his or her injury, and that the injury or damage was either a direct result or a reasonably probable consequence of the negligent act or omission." *Durphy v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 698 A.2d 459, 465 (D.C. 1997). Contributory negligence is "conduct 'which falls below the standard to which a plaintiff should conform for his own protection' and contributes to the plaintiff's injury." *Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C. 1980) (quoting Restatement (Second) of Torts § 496E, Comment a (1965)). It is "the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances." *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985). "[T]he defense of contributory negligence requires a determination of what the plaintiff should have known and acted upon in the exercise of reasonable care for his own safety," *Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C. 1979), and "generally involves inadvertence or failure to observe or act," *Harris v. Plummer*, 190 A.2d 98, 100 (D.C. 1963).

Unlike the assumption-of-risk doctrine, which operates only when the plaintiff actually knows the full scope and magnitude of a danger but voluntarily exposes himself to it, contributory negligence applies "'when a party knows or by the exercise of ordinary care *should have known* a particular fact or circumstance . . . .*" *Stager*, 494 A.2d at 1311 (quoting *Sierra*

*Pacific Power Co. v. Anderson*, 358 P.2d 892, 894 (Nev. 1961)) (emphasis in original). The contributory negligence framework also applies in cases of unreasonable risk taking, *District of Columbia v. Mitchell*, 533 A.2d 629, 639 (D.C. 1987), involving allegations that a plaintiff voluntarily but unreasonably accepted a known risk, in which case "the focus . . . is on the reasonableness of the plaintiff's conduct rather than the voluntariness of it." *Phillips v. Fujitec America, Inc.*, 3 A.3d 324, 328 (D.C. 2010).

"Whether a plaintiff is contributorily negligent is usually a question for the jury" and "it is the rare case with evidence so clear and unambiguous that contributory negligence should be found as a matter of law." *Paraskevaides v. Four Seasons Washington*, 292 F.3d 886, 893 (D.C. Cir. 2002) (internal quotation marks omitted). That being said, "[s]ome fact patterns allow [the court] to take the question away from the jury." *Phillips*, 3 A.3d at 329 n.16. Accordingly, when "reasonable persons, after viewing the facts in the light most favorable to the non-moving party, can draw but one inference from those facts, and where that one inference points 'unerringly' to the conclusion that the plaintiff failed to act reasonably under the circumstances, [the court] may find that [the plaintiff] was contributorily negligent as a matter of law." *Id.* (quoting *Starks v. North East Ins. Co.*, 408 A.2d 980, 982 (D.C.1979)). The burden of proving contributory negligence by a preponderance of the evidence, however, rests with the defendants. *Aetna Cas. & Sur. Co. v. Carter*, 549 A.2d 1117, 1119 (D.C. 1988); *Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997).

**II.**

The undisputed evidence reveals that there are three instances when Frank Stotmeister's own negligence contributed to his injury and death. First, when the water from the cut water-main pipe began to overflow the trench and flood the steam vault and manholes, Frank Stotmeister should have exercised his authority as the superintendent of the water line tie-in project to (A) halt the project entirely, (B) notify officials at GSA HOTD about the abnormal situation involving the steam system and/or (C) shut down the steam system at the Point of Connection. Instead, Frank Stotmeister acted unreasonably by failing to notify GSA HOTD officials that the steam system was being exposed to an unusual amount of water from the cut water-main pipe, directing the contractors to continue working in the trench despite all signs that the abnormal circumstances were creating a hazard, and failing to shut down the steam system to eliminate the risk of a steam leak or explosion posed by the hammering steam pipe.

The plaintiffs do not dispute that, as Grunley-Walsh's superintendent, Frank Stotmeister was responsible for all the construction activities and subcontractors on site the morning of the steam explosion. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 71, Bassem Soueidan Dep. 15:20-16:6 (Jan. 18, 2008) [ECF No. 206-6] (stating that Frank Stotmeister's responsibilities as superintendent were to "[b]asically oversee all of the construction activities, coordinate the subcontractors, coordinate with the client to a certain extent, and make sure that scheduled milestones are met" and he was "basically the front man for Grunley-Walsh on a day-to-day basis, or in this case a night-to-night basis since the job was done at night"); *accord* J.A. In Supp. of Joint Mot. for Summ. J. Ex. A, Brian Staudenmaier Dep. 14:4-14:9 (Mar. 12, 2008) [ECF No. 161-1] (stating that he was Frank Stotmeister's immediate

supervisor but that Stotmeister "had the day-to-day responsibility, oversight of the job and the contractors on the site").  It also is undisputed that Frank Stotmeister was responsible for safety at the job site and was "authorized to immediately stop work at the job-site if any . . . safety hazard is observed . . . ."  United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 10, Grunley-Walsh Joint Venture, Price Proposal, Section 2.H Safety Program at 43 [ECF No. 122-1].  Frank Stotmeister also was contractually responsible for administering and enforcing Grunley-Walsh's Safety and Accident Prevention Plan, including "[a] thorough and continuing analysis of potential hazards."  *Id.* at 42.  Moreover, in the event of an emergency, Grunley-Walsh's contract authorized Frank Stotmeister to shut down the entire steam system at the Point of Connection located in the vault at the intersection of 17th Street and New York Avenue.[16]  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 25, Expert Witness Report of Suzanne H. Harness 8 (Apr. 29, 2010) [ECF No. 202-12]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 215:9-215:19 (Mar. 1, 2011) [ECF No. 122-1]; United States' Mot. for Summ. J. Ex. 2, Greg Westphal Dep. 309:18-310:4 (March 11, 2010) [ECF No. 85-1].

The plaintiffs concede that the water flooding the steam vault was "abnormal and problematic."[17]  Stotmeister Pls.' Disputed Material Facts ¶ 39 [ECF No. 196-2].  Frank

---

[16]      *See* discussion *infra* Part III describing this authority.

[17]      After the contractors performing the water line tie-in project began cutting the water-main pipe it became apparent that the pipe never fully drained and was continuing to flow at a rate that subcontractor Dayrell Schneider found to be "alarming" and "overwhelming."  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 50:1-50:4; 188:4-188:5 (May 12, 2010) [ECF No. 206-1]; *accord* Stotmeister Pls.' Disputed Material Facts ¶ 39 [ECF No. 196-2] (stating that "[a]ccording to . . . Dayrell

Stotmeister knew or should have known that the hammering in the steam pipe was being caused by this abnormal flooding. Frank Stotmeister knew that the water from the water-main pipe was overflowing the trench and flooding the steam tunnel toward Manhole 10 because it was visible from where he stood at the trench. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 157:6-157:21 (Dec. 10, 2007) [ECF No. 205-15]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. K, Gary Sims Dep. 100:16-100:22 (July 7, 2010) [ECF No. 162-4] (stating that he did not inform anyone that the berm was leaking because "Mr. Frank . . . was standing right over top of the hole"). Steam also could be seen rising out of the manholes, Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 208:1-208:12 (Dec. 10, 2007) [ECF No. 205-15], and Dayrell Schneider testified that Frank Stotmeister said that water was running down the tunnel into Manhole 10, *id.* at Ex. 65, Dayrell Schneider Dep. 157:11-157:13 ("And you have Joe and Frank saying, [w]e're getting water in 10 coming down the tunnel."). The steam pipe began hammering only after the water from the water-main pipe overflowed the trench and made contact with the steam pipe, indicating that the hammering was being caused by the overflowing water. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 208:1-208:12 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 83:13-84:6, 89:4-89:20, 101:3-101:21, 200:12-201:9, 233:21-237:21 (May 12, 2010) [ECF No. 206-1]; *id.* at Ex. 67, Gary Sims Dep. 91:7-94:22 (July 7, 2010) [ECF No. 206-2]; *id.* at Ex. 68, Gary Sims Dep. 285:12-286:18, 328:2-328:9; *id.* at Ex. 28, Dexter Holmes Dep. 169:4-169:17, 171:17-172:2 (Dec. 9, 2010) [ECF No. 202-15]; J.A. In Supp. of

Schneider . . . the amount of water pouring out of the water main was unusual, unacceptable, and even alarming").

--28--

Joint Mot. for Summ. J. Ex. K, Gary Sims Dep. 91:7-94:22 (July 7, 2010) [ECF No. 162-4]; *id.* at Ex. L, Dayrell Schneider Dep. 167:21-171:4, 224:1-224:11 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex. M, Dayrell Schneider Dep. 298:14-300:20 (May 12, 2010) [ECF No. 162-6]; *compare* Statement of Material Facts Not In Dispute ¶ 40 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 40). The plaintiffs concede that "[t]he water flowing from the 20-inch water main entered the steam vault" and "contacted the steam lines[,]" which "caused condensate to form rapidly and mix with the steam in the steam lines" and "[w]hen that happened, the steam pipes jumped and made a loud hammering noise." Stotmeister Pls.' Disputed Material Facts ¶ 72 [ECF No. 196-2].

Frank Stotmeister also knew or should have known that the hammering steam pipe was a danger. When the steam pipe started hammering, Dayrell Schneider (1) ordered the subcontractors to evacuate the trench, (2) told Frank Stotmeister that he felt the situation was hazardous, [18] and (3) asked Stotmeister three times to shut down the steam system,[19] putting

---

[18]     Indeed, one of the plaintiffs' expert witnesses stated that he "understood [the contractors] were pretty scared." Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 56, Roland O'Brien-Bills Dep. 358:14-358:15 (June 3, 2011) [ECF No. 205-6]. And the only logical interference to be drawn from Frank Stotmeister's assurances that the steam pipe had survived prior rain water, he had seen the steam pipes hammer on other occasions, and the steam pipes were schedule 80 -- which was a reference to the thickness of the pipes, *see supra* n. 10 -- is that he knew that the hazard at issue was a pipe leak or explosion.

     The plaintiffs argue that this cumulative evidence "creates an inference that Mr. Stotmeister did not fully appreciate the nature of or risks associated with water hammer." Pls.' Mem. of P&A In Opp'n to Defs.' Joint Mot. for Summ. J. 23 [ECF No. 196]. Frank Stotmeister's reference to the thickness of the pipe belies the plaintiffs' theory, though. In light of all the circumstances then occurring, the only rational reason to mention the thickness of the pipe would have been to support Frank Stotmeister's belief that, because of its thickness, the pipe would not crack or burst. Absent concerns about the risk of cracking or bursting, which would lead to a steam escape or explosion, there simply is no other logical relevance to be associated with the thickness of the pipe in this Court's view.

Stotmeister on notice that Schneider believed the situation was dangerous.[20]  Furthermore, after

Dayrell Schneider asked Frank Stotmeister to shut down the steam system, Stotmeister ordered

the contractors to create a berm out of backfill to prevent water from flowing into the steam

tunnel.[21]  Frank Stotmeister's actions in this regard lead to the logical inference that Stotmeister

knew there was a correlation between the water flooding the steam tunnel and the hammering

---

[19]     J.A. In Supp. of Joint Mot. for Summ. J. Ex. L, Dayrell Schneider Dep. 167:20-169:14, 223:9-224:19 (Dec. 10, 2007) [ECF No. 162-5]; *id.* at Ex. M, Dayrell Schneider Dep. 298:14-300:20 (May 12. 2010) [ECF No. 162-6]; Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 238:17-238:21 (Dec. 10, 2007) [ECF No. 205-15]; *id.* at Ex. 66, Dayrell Schneider Dep. 84:3-84:6, 86:4-86:20, 208:12-209:15 (May 12, 2010) [ECF No. 206-1]; *id.* at Ex. 67, Gary Sims Dep. 213:17-213:20 (July 7, 2010) [ECF No. 206-2]; *id.* at Ex. 68, Gary Sims Dep. 297:18-298:17, 328:2-328:13, 329:3-329:11 (Mar. 2, 2011) [ECF No. 206-3]; *compare* Statement of Material Facts Not In Dispute ¶ 43 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts [ECF No. 196-2] (indicating no dispute with paragraph 43).

[20]     Dayrell Schneider testified that he believed the hammering was dangerous:

> Q      I -- I -- I take it you believed that was dangerous?

> A      I -- you know, with all my experience, yes.

Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 66, Dayrell Schneider Dep. 208:21-209:2 (Dec. 10, 2007) [ECF No. 206-1].  Gary Sims also testified that he was personally afraid when the pipes started hammering.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 68, Gary Sims Dep. 328:2-328:9 [ECF No. 206-3].

[21]     *Compare* Statement of Material Facts Not In Dispute ¶ 44 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts ¶ 44 [ECF No. 196-2] (indicating no dispute with the fact that "Sostmeister directed that backfill material be placed into the excavation trench to create a berm to stop the water from exiting the excavation trench"); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 176:1-176:10 (Dec. 10, 2007) [ECF No. 205-15] ("And then Frank had us put up a whole load of RC6 to dam on the top of the steam line to dump a whole load in there and actually make a temporary dam to eliminate some of the water."); J.A. In Supp. of Joint Mot. for Summ. J. Ex. K, Gary Sims Dep. 101:12-103:4 (July 7, 2010) [ECF No. 162-4].

that was occurring in the steam pipe -- and he recognized that the situation was problematic; otherwise, there would have been no reason to take the precaution of building a berm.

The plaintiffs' own expert witness explained that once the water hammering occurred there was "a high degree of risk" that warranted evaluation by "the [GSA] HOTD people, who are experts in their system" to determine why the water hammer was occurring and "[w]hat is the damage as a consequence of all this water getting in -- in the steam tunnels[.]"  United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 185:5-20 (Mar. 1, 2011) [ECF No. 122-1].  Another of the plaintiffs' expert witnesses characterized the water hammering in the steam pipe as "a dangerous condition," Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 58, Roland O'Brien-Bills Report 2 (Jan. 20, 2011) [ECF No. 205-8], and found that "[t]he development of the water hammer in the high-pressure steam piping along 17th Street NW should have constituted an emergency," *id.* at 79. Significantly, that same expert witness also concluded that "[t]he reasonable standard of care . . . was to secure the large steam-stop valve in the steam tunnel [at] New York Avenue and 17th Street NW *when water started to enter the steam tunnel crawl-space and manholes*[,]"[22] *id.* at 79

---

[22]     Although this finding stated that Day & Zimmerman employees should have shut the steam down at the Point of Connection, there is no evidence that anyone from Day & Zimmerman was at the work site at the time the water line tie-in project was taking place and there is no evidence that Frank Stotmeister or any other contractor attempted to contact anyone at Day & Zimmerman to alert them about the situation.  Regardless, the relevant point is that if the steam system had been shut down at the Point of Connection at the time the water began flooding the steam tunnel, the explosion that killed Frank Stotmeister and Joseph Hudert might not have happened.  And the evidence in the record reveals that, at the time the water line tie-in project was taking place, Frank Stotmeister was the individual with both the knowledge of the situation and the contractual authority to shut down the steam system at the Point of Connection.  Frank Stotmeister nonetheless made the decision to proceed with the water line tie-in project without shutting down the steam system despite Dayrell Schneider's request that the steam be cut off to ensure the contractors' safety.

(emphasis added).  The plaintiffs' expert also found that "[t]he simple decision of closing the steam-stop [valve] at the steam tunnel at New York Avenue and 17th Street NW [the Point of Connection] at around 2:30-AM when the hammer first occurred would have prevented the steam-condensate water hammer that occurred after 2-AM to 8:51-AM."  *Id.* at 79.  In other words, given that an emergency was occurring, if Frank Stotmeister had exercised his authority to shut the steam down at the Point of Connection when Dayrell Schneider thrice asked him to do so the steam explosion that killed Stotmeister and Joseph Hudert might not have occurred.

The same expert who found that the tragedy might have been avoided by shutting the steam system down at the Point of Connection when water began flooding the steam tunnels also concluded that "[f]looding from the water main(s) into the steam tunnel crawl space and manholes and on the steam pipe caused the steam-condensate water hammer."  *Id.* at 80.  The expert further stated during a deposition that the conditions during the water line tie-in project were "abnormal" and no particular training would be needed to understand that if the steam vault and manholes were being flooded with water there might be condensate forming in the steam line.  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 57, Roland O'Brien-Bills Dep. 848:4-849:14 (June 8, 2011) [ECF No. 205-7] (stating "I don't think you need particular training to understand the physics, especially when it's first pointed out").  Consistent with the expert's testimony, Dayrell Schneider stated during a deposition that, with respect to the water flowing into the steam tunnel, he viewed the situation to be "not normal."  Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 65, Dayrell Schneider Dep. 173:11-173:21 (Dec. 10, 2007) [ECF No. 205-15].

As the superintendent of the water line tie-in project Frank Stotmeister was the responsible contractor on site who had the authority to halt the project, call GSA HOTD personnel to advise them about the abnormal flooding in the steam system and confirm whether it was safe to proceed with the project, or shut down the steam system at the Point of Connection when the steam pipes started hammering and Dayrell Schneider asked him three times to do so.[23] Frank Stotmeister could see that the steam tunnel was being flooded by the water overflowing the trench and was on notice that the subcontractors considered the situation to be dangerous. By exercising his authority to shut down the steam system or halt the work at that point in time, Frank Stotmeister could have eliminated the risk of danger posed by the steam pipe and prevented the tragic explosion that ultimately killed him. Instead, Frank Stotmeister directed the contractors to dump backfill into the trench and continue working, despite all indications that a dangerous situation had evolved, and without ever notifying officials at GSA HOTD about the water flooding the steam tunnel. As a consequence, the water continued to overflow the trench, flood the steam tunnel, and cause condensation to build in the steam pipe, which ultimately led to the water-hammer blast that exploded from the drip leg in Manhole 11 and killed Frank Stotmeister and Joseph Hudert. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 57, Roland O'Brien-Bills Dep. 812:1-812:20 (June 8, 2011) [ECF No.

---

[23]     From the Court's vantage point, Dayrell Schneider modeled the behavior of a reasonable person under the circumstances. Although he was not a steam specialist, he sensibly recognized that an unusual and potentially dangerous situation was occurring in light of the volume of water flooding the trench and steam tunnel, the steam rising from the manholes, and the hammering of the steam pipe. He immediately halted the subcontractors' work on the water line tie-in project and ordered the subcontractors to evacuate the trench to ensure their safety. He then sought out the superintendent, expressed his concern about the hazard posed by the hammering steam pipe, and requested that the steam system be shut down to eliminate the risk of danger to the subcontractors. *See* factual sources cited *supra* Parts C, D.

205-7] (stating that excess condensation was forming in the steam pipes as a result of the water overflowing from the main); *id.* at Ex. 58, Roland O'Brien-Bills Report 54 (Jan. 20, 2011) [ECF No. 205-8] (stating that shock waves from the mixing of condensation and steam in the pipe blew the drip leg). Under the circumstances, Stotmeister's failure to halt the water line tie-in project, shut down the steam system, or contact GSA HOTD to confirm the safety of the flooded steam system was both unreasonable and imprudent.[24]

## III.

The second instance when Frank Stotmeister's negligence contributed to the cause of his injury and death occurred when Stotmeister shut off the steam-line valve in Manhole 11 at the behest of Thomas Johnson and the plumbers who were attempting to repair damage to the NEOB steam station caused by the steam system water hammering. When requested to shut off the steam, Frank Stotmeister did so unreasonably by (1) entering Manhole 11 without authority and (2) operating the steam-line valve located in Manhole 11 without authority.

Frank Stotmeister had no authority to enter Manhole 11 because it was restricted federal property that was outside the scope of work for the water line tie-in project. United States' Mot.

---

[24] Particularly if, as the plaintiffs argue, Frank Stotmeister "was not a steam expert" and "evidently he knew nothing about water hammer and how dangerous it is." Pls.' Mem. of P&A In Opp'n to Defs.' Joint Mot. for Summ. J. 13 [ECF No. 196] (internal quotation marks omitted). Once Dayrell Schneider notified Frank Stotmeister that he viewed the steam pipe hammering to be a danger, the reasonable course of action would have been for Stotmeister to confirm whether a danger actually existed -- as he was contractually required to do, *see supra* Part II at 27 (describing the contractual requirement to thoroughly analyze potential hazards -- rather than relying on his own inexpert opinion. Confirmation about the safety of the steam pipe could have been quickly accomplished by calling officials at GSA HOTD or even Grunley-Walsh's own subcontractor, M&M Welding, which Bassem Soueidan characterized as "a steam specialist." J.A. In Supp. of Joint Mot. for Summ. J. Ex. C, Bassem Soueidan Dep. 124:1-124:3 (Jan. 18, 2008) [ECF No. 161-3].

for Summ. J., Supplemental Decl. of Greg Westphal ¶ 4 [ECF No. 106-1] (stating that "[e]ntry

into the Steam Distribution Complex ('SDC') is highly restricted"); United States' Mot. for

Summ. J. Ex. 2, Greg Westphal Dep. 1128:2-1128:8 (June 1, 2010) [ECF No. 85-1] ("Nobody

was authorized to go into that manhole at any time. There was no work being performed in that

manhole. They had no authority -- they had no business being in that manhole . . . regardless.");

*id.* at 1128:9-1128:21 ("Nobody had permission to go down in the manhole. There was no work

being performed."); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for

Summ. J. Ex. 70, Bassem Soueidan Dep. 188:15-188:19 (Mar. 16, 2007) [ECF No. 206-5] ("I

can tell you that, prior to the date of the incident, all contract work related to the Steam Line

Replacement Project, specifically as it relates to that portion of the work, was completed and

back on service."); United States' Mot. for Summ. J. Ex. 3, Dayrell Schneider Dep. 226:6-227:13

(May 12, 2010) [ECF No. 85-1] (affirming that there was no work involving Manhole 11 and

there was no reason for the contractors to be in that manhole the morning of April 23); United

States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 5, Bassem Soueidan Dep. 167:14-

167:16 (Mar. 27, 2008) [ECF No. 122-1] ("After we turned the steam over two to three weeks

prior to the date . . . we had no business touching the steam system").

 Moreover, even assuming for the sake of argument that Frank Stotmeister was authorized

to enter Manhole 11, it is undisputed that he was never authorized to manipulate the steam-line

valve located in that manhole, regardless of whether he was directed to do so by the government.

J.A. In Supp. of Joint Mot. for Summ. J. Ex. B, Bassem Soueidan Dep. 151:16-152:12 (Mar. 16,

2007) [ECF No. 161-2] (stating that, with respect to Grunley-Walsh, "[w]e were not allowed to

turn a valve on or off . . . by contract"); United States' Combined Reply In Supp. of Mot. for

Summ. J. Ex.7, Mark Middleton Dep. 181:8-182:20 (Apr. 12, 2010) [ECF No. 106-2] (agreeing that when the steam system needed to be shut off or on that it was to be done by GSA and no one else); *id.* at Ex. 6, Thomas Johnson Dep. 435:7-435:13 (Nov. 17, 2010) [ECF No. 106-2] (stating that contractors "cannot operate the steam valves"); Pls.' Mem. of P. & A. In Opp'n To Defs.' Joint Mot. for Summ. J. 21 [ECF No. 196] (noting Bassem Soueidan's testimony that Grunley-Walsh does not operate systems for owners). Indeed, Frank Stotmeister's boss, Bassem Soueidan,[25] confirmed that "*with or without direction from the government*, we as a contractor don't typically handle life systems," United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 1, Bassem Soueidan Dep. 71:3-71:5 (May 25, 2010) [ECF No. 106-2] (emphasis added), and "[w]e were not authorized . . . to do either, de-energize or energize the steam line," using the feeder and shut-off valves along the steam line, *id.* at 52:5-6. *Accord* Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 188:2-188:8 (Mar. 16, 2007) [ECF No. 206-5] (confirming that Grunley-Walsh was not allowed to turn steam on or off at the job site because "by contract, that's not our scope of work to do"). This point is further corroborated by an expert report submitted by the plaintiffs that states that "[c]ontractors do not have the authority to operate GSA steam valves . . . ." Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 25, Expert Witness Report of Suzanne H. Harness 8 (Apr. 29, 2010) [ECF No. 202-12].

There is no question that Frank Stotmeister knew he was not authorized to manipulate the steam-line valve in Manhole 11 for the purpose of shutting off the steam because Grunley-Walsh

---

[25] Exs. In Supp. of United States' Mot. for Summ. J. Ex. 2, Bassem Soueidan Dep. 15:5-15:22 (March 16, 2007) [ECF No. 175-1] (stating that Frank Stotmeister reported to Bassem Soueidan).

employees were twice rebuked when Grunley-Walsh's subcontractor, M&M Welding, shut off

steam while performing work for the 17th Street Steam Distribution Project. During the first

occurrence, M&M Welding shut down a temporary boiler connected to Manhole 11 that was

supplying steam to the New Executive Office Building,[26] after which Grunley-Walsh and its

contractors were "reprimanded very heavily" by GSA officials. United States' Supplemental

Mem. In Support of Mot. for Summ. J. Ex. 4, Bassem Soueidan Dep. 36:7-36:9 (Mar. 16, 2007)

[ECF No. 122-1]. It is undisputed that, as a result, Frank Stotmeister attended a meeting during

which GSA officials admonished the contractors about the steam shut down,[27] J.A. In Supp. of

Joint Mot. for Summ. J. Ex. D, Bassem Soueidan Dep. 58:14-60:18 (May 25, 2010) [ECF No.

161-4], and Bassem Soueidan told Stotmeister that shutting off the steam was not to be done

again, *id.* at 71:10-72:15. In addition, Brian Staudenmaier, Frank Stotmeister's direct supervisor

at Grunley-Walsh, testified during a deposition that, after the incident, he forwarded to

Stotmeister a copy of a January 14, 2004, email from a GSA HOTD official stating that the

contractors could contact identified GSA HOTD personnel if they needed an "unexpected or

unplanned shutdown of the steam." United States' Combined Reply In Supp. of Mot. for Summ.

J. Ex. 5, Brian Staudenmaier Dep. 67:5-67:18 (Mar. 12, 2008) [ECF No. 106-2]. That email

---

[26]     Pls.' Mem. of P&A In Opp'n to Def.'s Joint Mot. for Summ. J. 17 [ECF No. 196]
(describing the circumstances of the steam shut down); J.A. In Supp. of Joint Mot. for Summ. J.
Ex. B, Bassem Soueidan Dep. 161:1-163:20 (Mar. 16, 2007) [ECF No. 161-2] (stating that "what
we did here was shut down the boiler . . . [w]e didn't touch any GSA systems"); *id.* at Ex. B,
Letter from Brian Staudenmaier to Thomas Johnson (Jan. 12, 2004) and Letter from Mark
Middleton to Brian Staudenmaier (Jan. 12, 2004) [ECF No. 161-2] (deposition exhibits).

[27]     M&M's Project Manager, Mark Middleton, testified that Frank Stotmeister was informed
that the contractors could not shut down the steam without first notifying GSA HOTD. Exs. In
Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 42, Mark
Middleton Dep. 226:20-227:18 (Apr. 12, 2010) [ECF No. 204-9].

stated that Grunley-Walsh should contact the specified GSA HOTD officials "[f]or emergencies when you need valves to be opened/closed." J.A. In Supp. of Joint Mot. for Summ. J. Ex. B, Email from Greg Westphal to Brian Staudenmaier (Jan. 14, 2004) [ECF No. 161-2] (deposition exhibit).

Another unauthorized occurrence took place about two weeks later and involved M&M Welding shutting down and re-opening the steam valve located in Manhole 7, which caused a steam pressure drop at the Old Executive Office Building. J.A. In Supp. of Joint Mot. for Summ. J. Ex. B, Email from Joel Klotz to Thomas Johnson with copies to Leonard Weiser, Greg Westphal and John Bright (Jan. 30, 2004) [ECF No. 161-2] (deposition exhibit); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 45:4-46:3 (Mar. 16, 2007) [ECF No. 206-5]. After that occurrence, emails between Grunley-Walsh officials and GSA officials indicated that, in the case of an emergency, Grunley-Walsh was authorized to enter the steam vault at the Point of Connection for the purpose of shutting down the entire steam system. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 3, Email from Brian Staudenmaier to Greg Westphal (Feb. 25, 2004) [ECF No. 201-3]; United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 3, Email from Brian Staudenmaier to Greg Westphal (Feb. 25, 2004) [ECF No. 106-1] (declaration exhibit).

Although GSA HOTD provided Grunley-Walsh with limited authority to shut down the entire steam system during an emergency, that authority applied only to the valve located at the Point of Connection and not to any valves located in manholes along the steam line. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 3 [ECF No. 201-

3] (stating that "[d]uring a steam emergency, and an emergency shutdown of the steam, GW will promptly be entering the vault at POC"); Exs. In Supp. of Pls.' Partial Opp'n to United States' Mot. for Summ. J. Ex 7, Bassem Soueidan Dep. 39:16-39:20, 41:1-42:15 (May 25, 2010) [ECF No. 97-7] (agreeing that the grant of authority to shut down the steam was limited to the valve at the Point of Connection).  Notably, Frank Stotmeister's boss testified during a deposition that the need for an emergency shut-down at the Point of Connection would be determined by Frank Stotmeister, albeit in consultation with the project team:

> Q      Who was it that was to determine whether or not there was a need for an emergency steam shutdown?  Who would have made that decision?
>
> A      I would say that would be the general contractor if we felt there was an emergency.
>
> Q      And who for you at Grunley-Walsh, the general contractor, would have made that determination?
>
> A      I would say that it would be – you know, our Project Superintendent, in this case Frank, and work together [sic] with the entire team.  It was a team effort.

J.A. In Supp. of Joint Mot. for Summ. J. Ex. B, Bassem Soueidan Dep. 71:13-72:2 (Mar. 16, 2007) [ECF No. 161-2].[28]  Aside from determining that an emergency steam shutdown at the Point of Connection was warranted,[29] however, the undisputed evidence is that Frank Stotmeister was not authorized to operate the steam-line valves in a manhole "with or without direction from

---

[28]      Given that Frank Stotmeister would have determined whether or not there was a need for an emergency shut down there is no merit to the plaintiffs' assertion that it was reasonable for Stotmeister to assume that, because Thomas Johnson did not give Stotmeister the key to the Point of Connection, Johnson did not view the situation to be an emergency, in which case Stotmeister need not employ the emergency procedure.  Pls.' Mem. of P&A In Opp'n to Defs.' Joint Mot. for Summ. J. 11-12 [ECF No. 196].

[29]      Which Frank Stotmeister failed to do.  *See supra* Part II.

the government." United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 1, Bassem Soueidan Dep. 71:3-71:5 (May 25, 2010) [ECF No. 106-2].

## IV.

The third instance when Frank Stotmeister's negligence contributed to the cause of his injury and death occurred when he opened the steam-line valve in Manhole 11. It remains entirely undisputed that, in nonemergency situations, no contractor was ever authorized to open a steam-line valve -- whether at the Point of Connection or in a manhole on 17th Street. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 25, Expert Witness Report of Suzanne H. Harness 8 (Apr. 29, 2010) [ECF No. 202-12] (stating that "[n]o procedures allowed a contractor to turn the steam back on"); *id.* at Ex. 70, Bassem Soueidan Dep. 188:2-188:8 (Mar. 16, 2007) [ECF No. 206-5] (stating that Grunley-Walsh was not permitted by the contract to turn steam on or off because doing so was "not our scope of work to do"); *id.* at Ex. 73, Bassem Soueidan Dep. 37:3-37:9 (May 25, 2010) [ECF No. 206-8] (agreeing that Grunley-Walsh and its employees were not authorized to operate the steam-line valves along 17th Street except); United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 215:17-215:19, 248:5-248:11 (Mar. 1, 2011) [ECF No. 122-1] (deposition testimony by the plaintiffs' expert witness confirming that "Stotmeister certainly knew that the protocol was that HOTD gets called; they turn on the system; we don't touch it"); *id.* at Ex. 5, Bassem Soueidan Dep. 167:13-167:16 (Mar. 27, 2008) [ECF No. 122-1] (stating that "[a]fter we turned the steam over . . . we had no business touching the steam system"). The uncontroverted evidence reveals that there was no emergency at the time Frank Stotmeister attempted to turn the steam back on by manipulating the steam-line valve in Manhole 11. Exs. In Supp. of Stotmeister

Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 72, Bassem Soueidan Dep. 182:15-183:1 (Mar. 27, 2008) [ECF No. 206-7] ("I would not consider that turning the valve back on is in fact an emergency"); *id.* at Ex. 73, Bassem Soueidan Dep. 167:7-167:8, 195:2-195:3 (May 25, 2010) [ECF No. 206-8] (stating "[a]t the time of the reopening, I don't believe there was an emergency"); J.A. In Supp. of Joint Mot. for Summ. J. Ex. D, Bassem Soueidan Dep. 166:19-167:8 (May 25, 2010) [ECF No. 161-4]; United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 246:11-246:17 (Mar. 1, 2011) [ECF No. 122-1] (deposition testimony by one of the plaintiffs' expert witnesses affirming that "there was no emergency at the time that Stotmeister turned on the valve in manhole 11 to reenergize the system"); United States' Combined Reply In Supp. of Mot. for Summ. J. Ex. 1, Bassem Soueidan Dep. 194:17-195:3 (May 25, 2010) [ECF No. 106-2] ("At the time of the reopening, I don't believe there was an emergency.").

It can be logically inferred from the undisputed evidence that the reason no contractor was authorized to open a steam-line valve was to ensure safety because of the danger presented by high-pressure steam. As one of the plaintiffs' expert witnesses acknowledged, "with high pressure steam . . . there's great risk and there needs to be a process to ensure that you [turn it on] safely" because "it's very dangerous." United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 213:16-213:20 (Mar. 1, 2011) [ECF No. 122-1]; *accord* Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 43, Mark Middleton Dep. 278:3-281:21 (May 18, 2010) [ECF No. 204-10] (stating that the process to open high-pressure steam valves was for safety and high-pressure steam must be handled properly to avoid water hammer and other complications). For more than a century federal courts have

recognized that steam, and the "escape of live steam," is dangerous, *Viscount De Valle Da Costa v. Southern Pac. Co.*, 176 F. 843, 845 (1st Cir. 1910) (noting that piping and valves permitted "the improper and dangerous escape of live steam") and Frank Stotmeister's boss stated that "anybody would" appreciate the dangers associated with working on a steam system, Ex. 73, Bassem Soueidan Dep. 133:3-133:8 (May 25, 2010) [ECF No. 206-8]. Thus, according to the plaintiffs' expert witness, "only people skilled in that process [of safely turning on steam] should be attempting to reenergize a steam system." United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 11, Robert Hixon Dep. 213:21-214:2 (Mar. 1, 2011) [ECF No. 122-1] (stating "[t]hat's true" and "I agree").

The undisputed evidence reveals that Frank Stotmeister was not skilled in the process of safely turning on steam. Frank Stotmeister reportedly knew a lot about steam, the dangers associated with steam systems, and the procedures to safely turn on steam by slowly opening the valves, but he was not a steam expert. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 43, Mark Middleton Dep. 278:3-281:21 (May 18, 2010) [ECF No. 204-10] (stating that Frank Stotmeister knew the procedure to open and drain the steam system and that the procedure was for "safety's sake");[30] *id.* at Ex. 70, Bassem Soueidan Dep.

---

[30]     The plaintiffs challenge Mark Middleton's deposition testimony that Frank Stotmeister understood the procedure by arguing that Middleton's testimony was only about the "chain of command" for re-energizing so Stotmeister was not aware of the "specific re-energization procedures used by HOTD." Pls.' Mem. of P&A In Opp'n to Defs.' Joint Mot. for Summ. J. 20 [ECF No. 196]. The plaintiffs apparently overlook, though, Mark Middleton's testimony that Frank Stotmeister was aware of the technical procedure that involved cracking a valve and draining the condensate and that Stotmeister knew that procedure was for safety. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 43, Mark Middleton Dep. 281:2-281:21 (May 18, 2010) [ECF No. 204-10]. The plaintiffs also fail to cite any other evidence to contradict Mark Middleton's testimony; as a result, it remains undisputed that Frank

145:12-22 (Mar. 16, 2007) [ECF No. 206-5] ("Frank been [sic] around mechanical systems for many, many years.  I believe he was a master plumber and a master HVAC.  That does not qualify him as a steam expert, but he's been around steam lines."); *id.* at Ex. 73, Bassem Soueidan Dep. 132:13-132:14 (May 25, 2010) [ECF No. 206-8] ("I would not say he's a steam expert, but he's experienced, yes."); *id.* at 133:3-133:8 (confirming that Frank Stotmeister appreciated the dangers associated with working on steam systems); J.A. In Supp. of Joint Mot. for Summ. J. Ex. A, Brian Staudenmaier Dep. 65:5-65:13 (Mar. 12, 2008) [ECF No. 161-1] (stating that Frank Stotmeister "knew a lot about steam").  Although Frank Stotmeister's boss stated that Stotmeister "knew about steam systems and knew how the system functions," J.A. In Supp. of Joint Mot. for Summ. J. Ex. C, Bassem Soueidan Dep. 122:19-123:3 (Mar. 27, 2008) [ECF No. 161-3], the plaintiffs nevertheless concede that Stotmeister's experience "did not include turning steam on and off," Stotmeister Pls.' Disputed Material Facts ¶ 10 [ECF No. 196-2], and "Frank Stotmeister had never turned on or turned off a steam valve on the 17th Street Steam system before April 23, 2004," *id.* at ¶ 73; *accord* J.A. In Supp. of Joint Mot. for Summ. J. Ex. C, Bassem Soueidan Dep. 122:14-123:3 (Jan. 18, 2008) [ECF No. 161-3] (stating that, to his knowledge, Frank Stotmeister had never personally turned steam on or off).  It goes without saying that someone who has no experience turning a steam system on is not "skilled"[31] -- as that term is commonly defined[31] -- in the process of safely turning on steam.

---

Stotmeister knew the technical procedure for opening a steam-line valve and that the purpose for the procedure was safety.

[31]     The term "skilled" is defined as "having acquired mastery of or skill in something (as a technique or a trade)."  Merriam-Webster's Collegiate Dictionary 1100 (10th ed. 1999).

Ultimately, though, whether Frank Stotmeister qualified as "skilled" is of no moment in light of the deposition testimony by one of the plaintiffs' expert witnesses who stated that no specialized training was necessary to understand that, if steam lines are being flooded with water, as happened in this case, there might be condensate forming in the steam lines and, furthermore, it would violate a reasonable standard of care to open a steam-line valve knowing that the steam line was flooded with condensate. Pls.' Mem. of P. & A. In Opp'n To Defs.' Joint Mot. for Summ. J. 25 [ECF No. 196] (identifying Roland O'Brien-Bills as "the Stotmeisters' expert"); Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 57, Roland O'Brien-Bills Dep. 763:12-764:5, 848:22-849:14 (June 8, 2011) [ECF No. 205-7]. The undisputed evidence shows that Frank Stotmeister knew that the steam lines were being flooded with water, *see* discussion *supra* Part II, in which case he should have known that condensate might be forming in the steam lines, Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 57, Roland O'Brien-Bills Dep. 763:12-764:5; 848:22-849:14 (June 8, 2011) [ECF No. 205-7]. The plaintiffs do not dispute that water condensate must be drained from a steam line before the steam is turned back on "or a dangerous situation is created which may cause water hammer or pipes to rupture." *Compare* Statement of Material Facts Not In Dispute ¶ 30 [ECF No. 160-1], *with* Stotmeister Pls.' Disputed Material Facts ¶ 30 [ECF No. 196-2] (disputing that "the technical or engineering reasons for turning off steam at the POC applied to Frank Stotmeister on the morning of April 23, 2004" but otherwise not disputing that the failure to drain condensate from a steam line creates a dangerous situation and might cause a water hammer). The plaintiffs' expert witness confirmed that such a dangerous situation materialized when he testified that Frank Stotmeister's act of opening the steam-line valve in

Manhole 11 created a "pressure difference" that increased the steam flow toward Manhole 11 and, when the steam mixed with water condensate, caused the "shock waves" or "blasting" that exploded from the drip leg in Manhole 11. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 58, Report from Roland O'Brien-Bills to William P. Lightfoot 54 Figure 11 (Jan 20, 2011) [ECF No. 205-8] (the quoted language is contained in the section of the expert report titled "Evidence, Observations and Findings").

Consequently, knowing that the steam lines had been flooded with water, it was unreasonable and dangerous for Frank Stotmeister to open the steam-line valve in Manhole 11, particularly when he had no authority to do so, no experience doing so, and had not first drained the water condensate from the steam system. Stotmeister's actions are inexplicable in light of the undisputed fact that GSA HOTD officials were "on call" in the event of an emergency the morning of the water line tie-in project, so Stotmeister could have contacted a GSA HOTD official before taking matters into his own hands. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 87, United States' Response to D&Z's First Set of Interrogs. 11 [ECF No. 207-14] (stating in response to Interrogatory No. 15 that more than nine GSA or HOTD employees "remain[ed] 'on call' in the event of an emergency, and, as reflected in the email from Greg Westphal dated January 14, 2004 . . . the contractors working along 17th Street, N.W. on the morning of April 23, 2004, had been provided telephone numbers of certain HOTD supervisors to contact in the event of an emergency"). Alternatively, Frank Stotmeister could have contacted officials at M&M Welding for assistance turning the steam-line valve on or off given that they were "steam specialist[s]" who Grunley-Walsh subcontracted with because of their expertise. Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J.

Ex. 70, Bassem Soueidan Dep. 145:1-145:4 (Mar. 16, 2007) [ECF No. 206-5]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. C, Bassem Soueidan Dep. 124:2-124:3 (Jan. 18, 2008) [ECF No. 161-3] (stating "I would consider M&M a steam specialist"). Frank Stotmeister's operation of the steam line by opening the valve in Manhole 11 in the absence of skill, experience or authority was unreasonable.[32]

## V.

The plaintiffs contend that Frank Stotmeister's actions shutting down and re-opening the steam-line valve in Manhole 11 was reasonable because he acted at the direction of Thomas Johnson, who the plaintiffs assert was the "project manager and on-site representative of GSA" and who Stotmeister viewed as a client. Stotmeister Pls.' Disputed Material Facts ¶ 6 [ECF No. 196-2]; Pls.' Mem. of P. & A. In Opp'n to Defs.' Joint Mot. for Summ. J. 5-7 [ECF No. 196] (quoted language on page 5). Even assuming that Frank Stotmeister viewed Thomas Johnson to be a "government representative" or "client," the plaintiffs cited no legal authority to support the proposition that, in the District of Columbia, a contractor may blindly follow a client's order and be immune from all liability for contributory negligence in carrying out the order. The plaintiffs likely cited no authority for this proposition because it appears that none exists in this jurisdiction -- as far as this Court can determine, the precise question of whether an exception to contributory negligence applies when a contractor's negligence occurs while carrying out a client's or superior's order has never been addressed by the District of Columbia Court of Appeals. For the foregoing reasons, though, the Court concludes that, even if such an exception

---

[32] As Frank Stotmeister's boss testified, "you need a steam expert for operations . . . ." Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 147:10-147:17 (Mar. 16, 2007) (explaining that a steam expert was not necessary to replace piping but was necessary to operate the steam line) [ECF No. 206-5].

existed, the particular facts of this case would not warrant its application because there were alternative methods Frank Stotmeister could have employed to reasonably execute an order to shut down or open the steam-line valve, but he chose to proceed in a way that demonstrated a lack of due care for his own safety.

As an initial matter, it is undisputed that Thomas Johnson was contractually prohibited from directing Grunley-Walsh's employees, including Frank Stotmeister, about the means, methods or procedures to accomplish a project. The Alion government contract under which Thomas Johnson was employed stated that "[t]he construction contractors are solely responsible for construction means, methods, sequences and procedures used in the construction of the projects, and for related performance in accordance with their contracts with the Government."[33] Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 2 at I-C-2 (subparagraph (g)) [ECF No. 201-2]; J.A. In Supp. of Joint Mot. for Summ. J. Ex. P, Thomas Johnson Dep. 671:11-673:14 (Nov. 17, 2010) [ECF No. 162-9] (confirming that Exhibit 2 of the Exhibits in Support of Stotmeister Plaintiffs' Memorandum of Points and Authorities In Opposition to Motions for Summary Judgment [ECF No. 201-2] consists of excerpts of Alion's contract and accurately reflects Alion's role on both the 17th Street Steam Distribution Project and the water line tie-in project). It therefore follows that, if Thomas Johnson told Frank Stotmeister to shut down or open the steam-line valve at Manhole 11, it was Frank Stotmeister's prerogative to determine the means, methods and procedures to accomplish that task. As already noted, *supra* Parts III and IV, Frank Stotmeister had only two reasonable means or methods to

---

[33] There was no contract between Alion and Grunley-Walsh. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 74, Brian Staudenmaier Dep. 43:10 (Mar. 12, 2008) [ECF No. 207-1].

accomplish a shut down of any part of the steam system, one that applied in cases of emergency and one that applied in all other circumstances. In the case of an emergency, Frank Stotmeister was authorized to shut down the entire steam system at the Point of Connection only. In all other cases, the only means by which Frank Stotmeister could shut down any part of the steam system was by contacting GSA HOTD and requesting that GSA HOTD perform the task. Again, under no circumstance, whether in the case of an emergency or otherwise, was Frank Stotmeister authorized to reenergize the steam system or open a steam-line valve.

To the extent that Thomas Johnson could direct Frank Stotmeister to do anything, that direction was limited to matters within the scope of work of Grunley-Walsh's contract, and turning steam on or off was not within that scope. As Bassem Soueidan explained, Thomas Johnson "can't direct [Frank Stotmeister] to do anything outside the contract." Exs. In Supp. of United States' Mot. for Summ. J. Ex. 2, Bassem Soueidan Dep. 55:5-55:6 (Mar. 16, 2007) [ECF No. 175-1]. The contracting officer for the 17th Street Steam Distribution Project also confirmed that a construction manager or project manager never has the authority to direct anyone to exceed the scope of work under a contract. Third Party Def. United States' Combined Reply In Support of Mot. for Summ. J. Ex. 3, Michael Vrobel Dep. 194:3-194:7 (Sept. 7, 2010) [ECF No. 106-2]. At best, Thomas Johnson could only "direct [Frank Stotmeister] to do things within the contract terms . . . ." Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 2, Bassem Soueidan Dep. 55:6-55:7 (Mar. 16, 2007) [ECF No. 206-5]. Bassem Soueidan confirmed that turning the steam on or off at the job site was *not* within the scope of Grunley-Walsh's contract. *Id.* at 188:2-188:8 ("We were not -- by contract, that's not our scope of work to do."). In fact, according to Bassem Soueidan, because the work on the steam system

had been completed by the time the water line tie-in project was underway, Grunley-Walsh employees, including Frank Stotmeister, "had no business touching the steam system." United States' Supplemental Mem. In Supp. of Mot. for Summ. J. Ex. 5, Bassem Soueidan Dep. 167:14-167:16 (Mar. 27, 2008) [ECF No. 122-1].

It also remains undisputed that Thomas Johnson lacked any authority to grant Frank Stotmeister access to the "highly restricted" Steam Distribution Complex, including the steam tunnels and manholes. United States' Mot. for Summ. J., Supplemental Decl. of Greg Westphal ¶¶ 4, 5 [ECF No. 106-1]. The Alion contract that Thomas Johnson worked under involved projects for the GSA White House Projects Office,[34] which "is a distinct division of GSA from HOTD." *Id.* at ¶ 5. "Personnel in the White House Center do not have authority to permit access into the SDC." *Id.* "Only HOTD personnel have authority to permit access into the manholes that are part of the SDC, such as manhole 11 on 17th Street." *Id.* at ¶ 6. The plaintiffs proffered no evidence to the contrary and there is no evidence that Thomas Johnson was ever held out to be a GSA HOTD (versus White House Center) representative or employee. Grunley-Walsh officials obviously did not view Thomas Johnson to be a GSA HOTD employee or representative given Bassem Soueidan's testimony failing to identify Johnson when asked whether there were any GSA HOTD personnel on site the morning of the accident:

> Q    On the night before and the morning of the accident, do you know if HODT [sic] personnel were on the job site?
>
> A    Not to my knowledge, I don't believe there would have been a need for them.

---

[34]    Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 2 (Alion's contract) [ECF No. 201-2]; Third Party Def. U.S.'s Combined Reply In Supp. of Mot. for Summ. J. Ex. 6, Thomas Johnson Dep. 433:1-433:21 (Nov. 17, 2010) [ECF No. 106-2].

Exs. In Supp. of Stotmeister Pls.' Mem. of P&A In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 189:14-189:19 (Mar. 16, 2007) [ECF No. 206-5]. Because there is no dispute that Thomas Johnson was not a GSA HOTD employee or representative, *a fortiori*, there likewise can be no dispute that he lacked the authority to grant Frank Stotmeister access to Manhole 11.[35]

Even if Thomas Johnson directed Frank Stotmeister to shut down or turn on the steam-line valve in Manhole 11 it was unreasonable for Stotmeister to take it upon himself to accomplish that task under the circumstances. The evidence reflects that Thomas Johnson lacked any expertise to direct the specific means by which the steam system or a steam-line valve should be shut down or turned back on. Thomas Johnson did not "have any role on the job with respect to turning steam on or off" -- he simply "coordinate[d]" steam shutdowns when Grunley-Walsh needed them. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 182:5-182:11 (Mar. 16, 2007) [ECF No. 206-5]. Thomas Johnson's role with respect to the 17th Street Steam Distribution Project was managerial and involved administrative responsibilities like scheduling, the approval of requisitions, and negotiating change orders. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots.

---

[35]    It is a long-standing principle of government contracting that "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). "And this is so even though . . . the agent himself may have been unaware of the limitations upon his authority." *Id.* Consequently, even assuming for the sake of argument that Thomas Johnson could be deemed a government agent or representative, because Johnson's request to shut down and turn on the steam was outside the scope of Grunley-Walsh's contract, the request arguably would have constituted a new request for work, which would have resulted in a new agreement (whether by a change order or otherwise) for which Grunley-Walsh, and Frank Stotmeister, bore the burden of ensuring that Johnson was acting within the bounds of his actual authority. *Id.*

for Summ. J. Ex. 71, Bassem Soueidan Dep. 110:11-110:16 (Jan. 18, 2008) [ECF No. 206-6]; *id.* at Ex. 38, Richard Matkins Dep. 182:8-182:14 (Dec. 12, 2007) [ECF No. 204-5] (stating that Thomas Johnson "was in management" and "was suit and tie" versus working in manholes). Thomas Johnson had no steam experience, no understanding about the implications of, or the purpose for, the GSA plumbers' request to turn the steam off on April 23, 2004, and he did not understand what water hammering was. J.A. In Supp. of Joint Mot. for Summ. J. Ex. P, Thomas Johnson Dep. 96:6-96:19, 121:8-123:17, 151:2-151:17 (Feb. 4, 2008) [ECF No. 162-9]; Third Party Def. U.S.'s Combined Reply In Supp. of Mot. for Summ. J. Ex. 6, Thomas Johnson Dep. 427:8-427:17 (Nov. 17, 2010) [ECF No. 106-2]. As Bassem Soueidan explained, Thomas Johnson did not "manage [Grunley-Walsh's] operations" but, instead, "basically" acted as "the liaison between the Government and the contractor." J.A. In Supp. of Joint Mot. for Summ. J. Ex. B, Bassem Soueidan Dep. 70:9-70:16 (Mar. 16, 2007) [ECF No. 161-2]. There is no evidence to contradict this.

There also is no evidence indicating that Thomas Johnson ordered Frank Stotmeister to *personally* operate the steam-line valve in Manhole 11. To the contrary, the record reflects that Thomas Johnson understood that only GSA HOTD could turn the steam on and off[36] and that Frank Stotmeister did "whatever was in the requirements to have it turned off at manhole number 11,"[37] implying that Johnson believed Stotmeister followed Grunley-Walsh's contract requirement to contact GSA HOTD to request a steam-system shut down or to turn on the steam-

---

[36] Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 30, Thomas Johnson Dep. 66:6-66:11 (stating that "[i]t's their system" so "[t]hey have to turn it on and off"), 81:5-81:15 (Mar. 12, 2007) [ECF No. 203-2].

[37] Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 31, Thomas Johnson Dep. 143:8-143:21 (Feb. 4, 2008) [ECF No. 203-3].

line valve in Manhole 11.  The evidence shows that Thomas Johnson did not view himself as

having either the contractual responsibility or the contractual authority to contact GSA HOTD to

request a steam shut down during the water line tie-in project because there was no contract

between his employer, Alion, and GSA HOTD, whereas there was such a contract between

Frank Stotmeister's employer, Grunley-Walsh, and GSA HOTD:

> Q    As you know, in the GSA report they indicate that only HODT [sic] was
>       to turn off the steam, correct?
>
> A    Correct.
>
> Q    And you read that in the report, right?
>
> A    That's correct.
>
> Q    And did you know that on April the 22nd of --
>
> A    I did.
>
> Q    Knowing that, did you call HODT [sic] to ask about turning off the steam?
>
> A    No.
>
> Q    Knowing that, did you call anybody from GSA about turning off the
>       steam?
>
> A    No.
>
> Q    Knowing that, why did you not ask somebody from HODT [sic] to turn off
>       the steam?
>
> A    Because I wasn't involved in the [water line tie-in] project, so how could I
>       ask them to turn something off in a project that I'm not involved in?  They
>       would not have recognized it.  They would not have known who I -- they
>       may not know who I was.  They understood who Frank was.  They
>       understood that Frank had a project going on out there, so he was the
>       contact between HODT [sic] and the steam at the time.

Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 31,

Thomas Johnson Dep. 97:13-98:16 (Feb. 4, 2008) [ECF No. 203-3].  The evidence further shows

that Thomas Johnson's only prior communications with GSA HOTD regarding steam system

shut down requests were purely ministerial to confirm that White House officials approved of the

timing of a shut down that Grunley-Walsh had requested from GSA HOTD during a project

progress meeting. Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for

Summ. J. Ex. 31, Thomas Johnson Dep. 98:17-106:20 (Feb. 4, 2008) [ECF No. 203-3]. The

record is devoid of any evidence that Thomas Johnson ever made such a request himself. As

Greg Westphal, the GSA HOTD mechanical engineer responsible for "coordinating steam

outages with customer buildings"[38] testified:

> Q        And, as of April 2004, was Tom Johnson, as project manager of the 17th
>          Street project, allowed to ask the government for a steam shutdown?
>
> A        The contractor [Grunley-Walsh] would request the shutdown during our
>          progress meetings, so he [Johnson] wouldn't actually make the request.
>          The contractor would – would made the request to the government.

Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 94, Greg

Westphal Dep. 33:8-33:16 (Apr. 13, 2010) [ECF No. 207-21].

Furthermore, even if Frank Stotmeister believed that he was being directed to personally

operate the steam-line valve in Manhole 11, it was unreasonable for him to do so without ever

alerting Thomas Johnson that he lacked the expertise, experience or contractual authority to do

so. There are times when common sense must prevail and this certainly was one of them in light

of the unusual circumstance involving the steam tunnel flooding, the danger involved, the fact

that Frank Stotmeister was the supervising contractor responsible for the construction activities --

---

[38]    Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 91, Greg Westphal Decl. ¶ 2 [ECF No. 207-18] (stating that "I was the mechanical engineer for Steam Distribution, with duties that included managing projects, coordinating steam outages with customer buildings, and locating drawings for other utilities working near the system").

and safety -- at the time, and the fact that Frank Stotmeister was knowledgeable about steam systems, whereas Thomas Johnson was not. If Frank Stotmeister was being asked to do something he did not know how to do he should have notified Thomas Johnson of that fact or sought appropriate guidance about how to safely accomplish the task by contacting officials at GSA HOTD or perhaps even subcontractor M&M Welding.

The notion that Grunley-Walsh officials, including Frank Stotmeister, were patsies who felt obligated to blindly follow government directives simply does not hold up against the evidence. From the outset of Grunley-Walsh's contracting relationship with GSA, Grunley-Walsh officials questioned government directives or performed in a manner that contravened government orders. For example, about six months after Grunley-Walsh was awarded the contract for the 17th Street Steam Distribution Project, Grunley-Walsh officials refused to perform the contract as awarded and told GSA "there is no way we can do what they're asking for." Exs. In Supp. of Stotmeister Pls.' Mem. of P. & A. In Opp'n to Mots. for Summ. J. Ex. 70, Bassem Soueidan Dep. 118:16-118:21 (confirming date contract was awarded), 120:19-20 (quote) [ECF No. 206-5]. In addition, as discussed *supra* Part III, Grunley-Walsh officials, including Frank Stotmeister,[39] were twice rebuked for shutting down parts of the steam system contrary to government directives prohibiting them from doing so. The Court therefore is not swayed by the plaintiffs' argument that "Mr. Stotmeister may even have believed that he would be labeled as uncooperative if he objected to the request" made by Thomas Johnson to turn the

---

[39]     Bassem Soueidan testified that Frank Stotmeister attended a meeting during which the prohibition on shutting down steam was discussed and Soueidan himself told Stotmeister that the steam was not to be shut down again. J.A. In Supp. of Joint Mot. for Summ. J. Ex. D, Bassem Soueidan Dep. 58:8-60:18, 71:10-72:15 (May 25, 2010) [ECF No. 161-4].

steam off or on.  Pls.' Mem. of P&A In Opp'n to Defs.' J. Mot. for Summ. J. On Issue of Contributory Negligence 7 [ECF No. 196].

Generally, the law has been reluctant to endorse a plaintiff's blind adherence to an order or directive when alternative methods to execute the directive are available but the plaintiff chooses to proceed in a way that demonstrates a lack of due care for his own safety.  Thus, for example, in *Wasilko v. United States*, 300 F. Supp. 573 (N.D. Ohio 1967), a federal district court held that a pilot who was killed when his plane crashed after taking off from an airport runway in the wake of a large airliner was not relieved of his own contributory negligence despite relying on a clearance that control-tower personnel negligently issued without warning the pilot of the risk of airliner wake turbulence.  300 F. Supp. at 598.  The court in *Wasilko* concluded that:

> The clearance to use an intersection takeoff did not relieve Pilot Wasilko from his final authority and responsibility in the control and operation o[f] his plane. Nor was the intersection takeoff clearance an order that he was blindly bound to follow. He had the right to 'use either another point on the runway or the full length of the runway,' FAA Flight Information Manual, Air Traffic Control Procedures, promulgated September, 29, 1961, and Tower Information Bulletin, Cleveland Hopkins FAA Tower Facility. To pilot his plane under the circumstances found to have then existed, knowingly behind TWA 224 and beneath its flight path, was a failure to exercise care for his own safety and constituted negligence on the part of Pilot Wasilko.

*Id.* at 598.

Likewise, in *Gish v. CSX Transp., Inc.*, 890 F.2d 989, 992-93 (7th Cir. 1989), the Seventh Circuit affirmed a district court's determination that there was sufficient evidence to support a jury verdict finding that a pipefitter was contributorily negligent for the back injuries he suffered when he tried to remove a wedged manhole cover to execute an order to clear a clogged sewer line.  The Seventh Circuit noted in *Gish* that there were multiple methods to remove the lid

safely and the jury was not required to believe that the supervisor ordered the pipefitter to proceed in the manner the pipefitter chose. 890 F.2d at 993.

Consistent with these cases, in *Alholm v. American Steamship Co.*, 144 F.3d 1172, 1179 (8th Cir. 1998), the Eighth Circuit rejected a plaintiff's argument on appeal that "because he was following orders the jury should not have been permitted to find him comparatively negligent or to consider whether there was a safe alternative course of action at the time . . . ." In *Alholm*, the plaintiff was a deckhand on a ship who suffered back injuries after holding a heavy cable while the ship was being re-docked. 144 F.3d at 1179. After stating that precedent did "not establish a blanket rule precluding a seaman from being found contributorily negligent when acting at the direction of a supervisor," the Eighth Circuit went on to find that there was sufficient evidence for the jury to conclude that the plaintiff chose the method of accomplishing the task and chose a less safe alternative that contributed to his injury. *Id.*

In a more recent case, albeit one that is unpublished, the Fifth Circuit in *Pallis v. United States*, No. 09-40088, 2010 WL 785171 (5th Cir. 2010) (per curiam), reviewed a district court's determination that a seaman was 75% contributorily negligent for injuries to his knee sustained while carrying out a supervisor's order to move trash on a ship. 2010 WL 785171 at **2-3. The facts revealed that, after being directed to move the trash, the seaman asked for help with bulky items and inquired about using a crane but was told that assistance was not available, the crane was not working, and chainfalls could be found throughout the ship to lift heavy objects. *Id.* at **1. The seaman was injured while carrying a 50-pound steel plate to an upper deck and argued on appeal that he had no obligation to find the safest means to perform the supervisor's directive to move trash. *Id.* at **1, 3. Unpersuaded by the seaman's argument that "the district court

erred when it found him contributorily negligent because he was following orders," the Fifth Circuit quipped that the plaintiff's argument "would make automatons of seaman" and conflicted with its prior precedent holding that "[a]lthough a seaman may not be obligated to find the safest method of performance . . . he has a duty to exercise the judgment and acumen of a seaman with like experience in like circumstances." *Id.* at **3 (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir.1997) (en banc)). Consequently, the Fifth Circuit affirmed the district court's conclusions that "because [the seaman] elected to move the object that caused his injury, rather than moving lighter items until assistance became available, he contributed to his injury" and "[he] could have used available chainfalls, but chose not to do so." *Id.*

In *Atchison, T. & S.F. Ry. Co. v. Seamas*, 201 F.2d 140 (9th Cir. 1952), the Ninth Circuit explained that, when an employee receives a general order about what is to be done, but not a specific order about how to do it, "an employee must use ordinary care in its execution, and the giving of the order does not affect the question of whether the servant has been negligent in his manner of carrying it out, where there is a choice open to him." 201 F.2d at 144. The Ninth Circuit's decision in *Jenkins v. Union Pacific R.R. Co.*, 22 F.3d 206, 211 (9th Cir. 1994) is in accord, stating "[w]e continue to adhere to the traditional rule that when an employee carries out his supervisor's general order in an unsafe manner, he is responsible under [the Federal Employer's Liability Act] for his own contributory negligence."[40]

Courts have, however, carved out an exception to contributory negligence when an employee is complying with a superior's specific order, which applies when the employee is

---

[40] In *Collins v. National R.R. Passenger Corp.*, 9 A.3d 56 (Md. 2010), the Court of Appeals of Maryland cited with favor the Ninth Circuit's decision in *Jenkins*, suggesting that Maryland courts would follow the specific order versus general order principle, at least as that principle applies to contributory negligence for claims asserted pursuant to FELA.

"following a direct order to perform a task *in a specific manner . . . .*" *Jenkins v. Union Pacific R.R. Co.*, 22 F.3d 206, 211 (9th Cir. 1994) (emphasis added). *Accord Stewart v. Illinois*, 41 Ill. Ct. Cl. 156 (Ill. Ct. Cl. 1989) (inmate absolved of contributory negligence for burns received when he was ordered to remove trays from an oven but the shelf holding the trays came loose and caused hot grease to spill on the inmate). Similarly, at least one state has created an exception when an employee's only choices are to perform under dangerous circumstances, lose his job or quit. *Miller v. Employers Mut. Liab. Ins. Co. of Wisconsin*, 349 So.2d 1353, 1361-62 (La. Ct. App. 1977) (summarizing several such cases). When, however, an employee has control over the manner of executing the ordered assignment the exception has not been applied. *Id.* at 1362 (finding that the plaintiff had "as great or greater knowledge" about the risk as the foreman and the plaintiff "had control of the specific manner in which the assignment was carried out" and voluntarily chose the method used).

Although nearly all of these cases involve tort actions by seamen and railway employees pursuant to the Federal Employer's Liability Act ("FELA") or the Jones Act, and none of these cases is controlling, they nevertheless are instructive and serve as cautionary examples that suggest to the Court that it should hesitate before adopting the plaintiffs' theory that Frank Stotmeister should be shielded from all contributory negligence for acts taken to execute an order from Thomas Johnson. Particularly when the plaintiffs cited no legal authority for their theory, no evidence demonstrating that Thomas Johnson had the actual authority to order Frank Stotmeister to personally shut down or turn on the steam-line valve in Manhole 11, no facts to show that Johnson ordered Stotmeister to personally operate the steam-line valve, and no evidence indicating that Johnson specified the method by which Stotmeister should accomplish

the shutting down or turning on of the steam system.  The plaintiffs are, in essence, asking this Court to create a new rule that has never been suggested by District of Columbia courts and is not warranted in light of the undisputed facts in this case.

## VI.

In the final analysis, the plaintiffs do not dispute that "[t]he cause of the steam release" that killed Frank Stotmeister can be attributed to the "water that flowed from the cut water main" and "inundate[ed] nearby steam lines" and that "[w]hen Mr. Stotmeister began to open the isolation valve in Manhole 11, the mixture of condensate and steam surged" and resulted in "high-pressure shock waves, known as steam-condensate water hammer" that "caus[ed] the massive eruption that fatally injured Messrs. Stotmeister and [Joseph] Hudert."  Stotmeister Pls.' Disputed Material Facts ¶ 72 [ECF No. 196-2].  This is a tragic case and there is no indication that Frank Stotmeister acted with anything other than the intent to ensure that the water line tie-in project was completed as quickly as possible so the streets could be reopened.  After considering all the undisputed facts, however, the inescapable conclusion is that Frank Stotmeister's decisions and actions while supervising the water line tie-in project -- particularly his profound failure to act to have the work suspended, the steam system shut down or the steam system evaluated when it became apparent that water from the water line tie-in project was causing an abnormal flooding of the steam vault -- were unreasonable and the proximate cause of the steam explosion that killed him.  Lest it be forgotten, Frank Stotmeister's unreasonable decisions and actions also resulted in the death of Joseph Hudert and serious injury to another contractor. Although he might simply have been doing his best to assist and accommodate Thomas Johnson when he twice operated the steam-line valve in Manhole 11, the fact of the matter is that the

catalyst for the tragedy was Frank Stotmeister's unreasonable decision to proceed with the water line tie-in project after it became clear that the water main pipe had not fully drained and the water was overflowing the excavation trench and flooding the steam system. Once Frank Stotmeister elected to press on with the project without notifying anyone at GSA HOTD about the unusual flooding, the die was cast for the disaster that occurred when he attempted to open the steam-line valve in Manhole 11 without the authority or skill to do so safely.

## CONCLUSION

For all the foregoing reasons, the Court holds that there is no genuine dispute as to any material fact and the preponderance of the evidence shows that Frank Stotmeister's negligence was a substantial factor in causing his injuries and death. The Court further holds that Frank Stotmeister's injuries and death were a direct result or reasonably probable consequence of his negligent acts or omissions. As a result, the Court will grant the Joint Motion for Summary Judgment of Alion Science and Technology Corporation, Cherry Hill Construction, Inc., Day & Zimmerman Group Services, DC Water and M&M Welding & Fabricators, Inc. on the Issue of Frank Stotmeister's Contributory Negligence [ECF No. 160] and judgment will be entered in favor of Day & Zimmerman and M&M Welding. The foregoing reasons also compel the Court to deny the pending Stotmeister Plaintiffs' Motion to Reconsider [ECF No. 246],[41] which was filed after the Court entertained oral arguments regarding the motion for summary judgment that

---

[41] A motion to reconsider "is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Dyson v. District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013) (internal quotation marks omitted). The Court finds that there is no intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice in light of the reasons announced by the Court in this decision.

is the subject of this decision.  Finally, the denial of the plaintiffs' motion for reconsideration renders moot the Joint Motion to Strike Plaintiffs' Motion to Reconsider [ECF No. 249] and Plaintiffs' Motion for Oral Argument [ECF No. 256].  An appropriate order shall accompany this memorandum opinion.


August 25, 2014

Thomas F. Hogan
Senior United States District Judge